UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

DAVID L. COUNTS,

              Plaintiff,

        vs.

KELLIE WASKO, in her individual and
official capacities; BRENT FLUKE, in
his individual and official capacities;
ALEJANDRO REYES, in his individual
and official capacities; REBECCA
SCHIEFFER, in her individual and
official capacities; ROB CARUNA, in his
individual and official capacities; MARK
STOEBNER, in his individual and
official capacities; TRAVIS
TJEERDSMA, in his individual and
official capacities; LYNN SCHREIBER,[1]
in his individual and official capacities;
TAMMY DOYLE, in her individual and
official capacities; MIKE DOYLE, in his
individual and official capacities; TONY
SHELBURG, in his individual and
official capacities; LEE KAUFENBERG,[2]
in his individual and official capacities;
KIM HALVERSON, in her individual and
official capacities; DR. AARON HAYNES,
in his official and individual capacities;
UNKNOWN VAN OSDALE, in his

4:23-CV-04103-KES


1915A SCREENING

---

[1] Counts refers to Lynn Schreibers in his complaint's caption, Lynn Schreiber
in his complaint's defendant list, and Lynn Schryvers throughout his
complaint's factual allegations. Docket 1 at 1, 3, 103, 128, 133. For screening
purposes, the court will assume that Counts is referring to the same person.
The court will refer to the defendant as Lynn Schryvers because that name is
used most frequently throughout Counts's complaint. *See id.* at 103, 128, 133.
[2] Counts refers to one defendant as Lee Kaufenberg and as Lee Kaufenburg
throughout his complaint. Docket 1 at 1, 3, 36–37, 76, 128, 133. The court will
refer to the defendant as Lee Kaufenberg because that name is used most
frequently throughout Counts's complaint. *See id.* at 1, 3, 76, 128, 133.

individual and official capacities;
TIFFANY VOIGT, in her individual and
official capacities; GTL TECHNOLOGY,
aka ViaPath Technology, in its
individual and official capacities;
JENNIFER WILSON, in her individual
and official capacities; STEPHANIE
HAMILTON, in her individual and
official capacities; KARRISA ZIMMER,
in her individual and official capacities;
BRENDA MUDDER, in her individual
and official capacities; TRACY FISHER,
in her individual and official capacities;
CANDICE FEJFAR, in her individual
and official capacities; BRITTNEY
MCGRATH, in her individual and
official capacities; DAYNA KLAWITTER,
in her individual and official capacities;
JANELLE BASTEMEYER, in her
individual and official capacities;
AMANDA DEJONG, in her individual
and official capacities; ELIZABETH
PAUL, in her individual and official
capacities; RACHEL TYCZ, in her
individual and official capacities;
STEPHEN BAKER, in his individual and
official capacities; CASSIE
DEFENBAUGH, in her individual and
official capacities; MARRY [sic]
CARPENTER, in her individual and
official capacities; MELISSA JOHNSON,
in her individual and official capacities;
BRITTNEY LENGKEEK, in her
individual and official capacities; DR.
MELVIN WALLINGA, in his official and
individual capacities; SUMMIT FOOD
SERVICES, in its official capacity;
ARAMARK FOOD SERVICES, in its
official capacity; UNKNOWN DOC
EMPLOYEES, in their individual and
official capacities; UNKNOWN
DEPARTMENT OF HEALTH
EMPLOYEES, in their individual and
official capacities; UNKNOWN DOC
CONTRACTORS, in their individual and

2

official capacities; GOVERNOR KRISTI
NOEM, in her individual capacity and
official capacity; AUDRA STROM,[3] in
her individual and official capacities;
ROBYN STOLZ,[4] in her individual and
official capacities; VANESSA GEBES, in
her individual and official capacities,

                    Defendants.

Plaintiff, David L. Counts, at times relevant an inmate at the Mike Durfee State Prison, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Docket 1. This court granted Counts leave to proceed in forma pauperis and ordered him to pay an initial filing fee. Docket 9. Counts timely paid his filing fee on July 7, 2023. Counts filed a motion for a temporary restraining order, which this court denied. Docket 7. Counts filed five supplements to his complaint alleging additional facts. Dockets 11, 12, 13, 16, and 18. He also filed a second motion for a temporary restraining order. Docket 14.

---

[3] Counts refers to Audra Storm and Audra Strom throughout his complaint. Docket 1 ¶¶ 110, 164, 169, 171, 222–223, 246, 248. The court will refer to the defendant as Audra Strom because that is the spelling used in Counts's medical records. *See* Docket 2-2 at 9.

[4] Counts refers to Robyn Stolz and Robin Stolz throughout his complaint. Docket 1 ¶¶ 66, 160, 174, 176, 450. The court will refer to the defendant as Robyn Stolz because that is the spelling used in Counts's medical records. *See* Docket 2 at 9.

# I.     1915A Screening

## A.     Factual Background

The facts alleged in Counts's complaint are: that several conditions at the Mike Durfee State Prison (MDSP) violate Counts's constitutional rights. Docket 1 at 6–129. Counts sues all defendants in their individual and official capacities,[5] except for Summit Food Services and Aramark Food Services, which are sued in their official capacities.[6] *See id.* ¶¶ 6–45. Counts "is suing for damages, declaratory, and injunctive relief, claiming that the Defendants violated, and conspired to violate his rights[.]" *Id.* at 1. On October 30, 2023, Counts informed the court that he had been transferred from the MDSP to the South Dakota State Penitentiary (SDSP).

### 1.     Medical Issues

#### a.     Hidradenitis

In 2017 to 2018, while in the Minnehaha County Jail, Counts suffered an outbreak of Hidradenitis Suppurativa, which is "a chronic bacterial infection

---

[5] Counts sues Dr. Mary Carpenter as the medical director of the South Dakota Department of Corrections in her individual and official capacities. Docket 1 ¶¶ 37, 254. Carpenter is no longer employed at the Mike Durfee State Prison. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while an action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). The current medical director is Dr. Aaron Haynes, who is automatically substituted for Dr. Carpenter on the official capacity claims against her.

[6] Summit Food Service, Aramark Food Service, and GTL Technology are private companies that have contracted with the state. Private companies act under color of state law when providing services in the prison and can be sued under § 1983. *See West v. Atkins*, 487 U.S. 42, 56 n.15 (1988). Thus, for the purposes of screening, the court assumes that Summit, Aramark, and GTL Technology were acting under color of state law.

which can cause inflammation of the sweat glands involving extensive skin lesions in the axillae, groin, and perineal areas." Docket 1 ¶ 48; Docket 2 at 3. Counts worked with specialists from infectious disease, dermatology, and plastic surgery for Hidradenitis treatment, which required two surgeries. Docket 1 ¶¶ 50, 51. Counts was provided Hibaclens soap and an "Adalapene" cream for daily use to prevent and limit Hidradenitis outbreaks. *Id.* ¶ 53.

Counts was incarcerated at the MDSP on September 20, 2018, at which time Counts only had prescriptions for Hidradenitis management. *Id.* ¶ 57. On April 19, 2022, Counts attempted to pick up from MDSP medical his refill for his prescribed "Adalapene" cream, after filing his request more than the required twelve days prior. *Id.* ¶ 163. The nurse stated Counts was limited to one tube per month, which was not previously the case. *Id.* Counts's mother contacted Warden Brent Fluke, who instructed Clinic Director Stephanie Hamilton to issue the cream. *Id.* On April 22, 2022, Hamilton stated Counts was not allowed a second tube until April 25, 2022. *Id.* Counts explained to her the concern from prior outbreaks, but Hamilton stated that she decided when medication would be issued because she ran medical, not the warden. *Id.* ¶¶ 163, 165; Docket 2-1 at 90. On July 15, 2022, Counts filed a report with the South Dakota Board of Nursing against Hamilton, and he mailed copies of the report to Wasko, Fluke, and Governor Noem. Docket 1 ¶¶ 165, 174.

On April 25, 2022, Counts had a Hidradenitis outbreak. *Id.* ¶ 164. Nurse Audra Strom examined him for swelling and infected boils. *Id.* Counts told her about Hamilton's interference with his treatment causing the outbreak, but

Strom did not document Counts's complaint about Hamilton. *Id.*; Docket 2-1 at 87. Counts received the medication, but the label indicated it had been at the prison for a week. Docket 1 ¶ 164. Counts alleges that he remained ill for a week because of Hamilton's delay in providing his medication. *Id.* ¶ 166.

On April 27, 2022, Provider Stephen Baker examined Counts for his Hidradenitis flare. *Id.* Counts described his prior surgeries and instructed to contact Sanford if there were any questions about his treatment. *Id.* Instead of contacting Sanford, Baker contacted Dr. S. Pepito who prescribed an injection of Rocephin and an antibiotic. *Id.*; Docket 2-1 at 93–94. On May 3, 2022, MDSP Nurse Candice Fejfar rechecked his Hidradenitis flare up. Docket 1 ¶ 168; Docket 2-2 at 3–4. Medical staff examined the flare up twice a week until it subsided. Docket 1 ¶ 168.

In December 2022, Counts was placed on medical lay-in trays but was still required to walk outside in negative temperatures for daily showers to prevent a Hidradenitis outbreak. *Id.* ¶ 219. Counts alleges that Harmon Hall, where he resided, had a medical shower that he could have used had proper sanitization occurred before and after his use, but he was instead required to walk 200 feet outside without medical assistance to use the medical shower. *Id.* ¶¶ 85, 88. Counts was on the medical delivery list to receive deliveries of Hibaclens soap at 4:00 pm daily, but he did not receive his deliveries, which Counts alleges was retaliation. *Id.* ¶ 227.

### b.    Covid-19, Lung, and Heart Conditions

When Counts was transferred to MDSP in 2018, his bony chest structures, heart size, and pulmonary vascularity were unremarkable on x-ray, and his only prescriptions were to treat his Hidradenitis. *Id.* ¶¶ 46, 50–51, 57; Docket 2 at 1. Counts could work out, play sports, and perform manual labor. Docket 1 ¶ 57.

During the Covid-19 pandemic in 2020, administration, Associate Warden Alejandro Reyes and Major Doyle, stated that MDSP would not enforce social distancing. *Id.* ¶ 59. Inmates were not socially distanced in meal lines and sat shoulder to shoulder during meals, with a plastic divider placed down the middle of dining hall tables. *Id.* ¶ 62. Staff members worked while they experienced Covid-19 symptoms because of staffing shortages. *Id.* ¶ 60. Despite knowledge of Covid-19's spread, the Department of Corrections (DOC) continued cross-state transports. *Id.* Counts alleges that the DOC's policies increased the likelihood of infection. *Id.*

On September 19, 2020, Counts felt ill and put in a kite for sick call. *Id.* ¶ 63. Covid-19 protocols required inmates to submit a kite on their unit describing symptoms. *Id.* ¶ 64. The kites were collected in the evening, and inmates were called to medical the next day, one at a time to prevent overcrowding. *Id.*

On September 20, 2020, Counts's roommate informed the officers' desk that Counts was unable to walk and extremely ill. *Id.* ¶ 65. Counts's room was on the second floor; two lieutenants carried him to the first floor and placed

him in a wheelchair. *Id.* Nurse Robyn Stolz examined Counts at medical, giving him a rapid Covid test and another test that was sent to the state lab. *Id.* ¶ 66. "Stolz noted [Counts had] symptoms of fatigue, trouble breathing, cough, diarrhea, and vomiting . . . [and] an aneurism in plaintiff's descending heart valve as an elevated risk factor." *Id.* Stolz notified Hamilton and Dr. Melvin Wallinga of Counts's condition. *Id.* Counts tested negative for Covid and was not diagnosed with any other condition, but Hamilton and Dr. Wallinga put him in isolation. *Id.* ¶ 67. During the Covid-19 pandemic, the Armory Building, originally a college gym with several classrooms, was converted into the isolation unit for people with Covid symptoms. *Id.* ¶ 61. Counts was assigned to a room for isolation, given only a cot on the floor, one blanket, and one pillow. *Id.* ¶ 68. Counts was held in Room 104, which had holes in the wall, doors covered with duct tape and plastic, and ripped and awful-smelling carpet. *Id.*

Quarantined inmates were required to walk outside to use porta-potties, instead of using the interior restrooms. *Id.* ¶ 70. On September 22, 2020, while attempting to walk to the porta-potties, Counts fell, and an officer provided him a folding chair to use as a walker. *Id.* The officer requested a wheelchair for Counts, but Hamilton denied that request. *Id.* Nurse Kimberly Neuhalfen checked on Counts the same day, noting his symptoms were worsening, and notified Hamilton and Provider Karissa Zimmer. *Id.* ¶ 71. Counts was placed on Prednisone and Ibuprofen and left unattended until Nurse Brenda Mudder

checked on him nearly twelve hours later. *Id.* ¶¶ 71–72. Mudder noted that Counts's symptoms were improving "without any factual basis." *Id.* ¶ 72.

On the morning of September 23, 2020, Nurse Tracy Fisher examined Counts and noted his condition was improving, despite Counts's reports of pain, continued coughing, shortness of breath, and fatigue. *Id.* ¶ 73. Counts alleges that Fisher falsified her report. *Id.* At Hamilton's orders and without receiving a discharge checkup, Counts was returned to his second floor room in Harmon Hall, experiencing the same symptoms he had when he had been transferred to the Armory. *Id.* ¶ 74; Docket 14-1 at 10. Counts alleges that Hamilton never examined him on September 23, 2020, yet issued a report claiming his fever was gone. Docket 1 ¶ 75. Hamilton refused to permit Counts to remain in bed during the four daily counts. *Id.* ¶ 77. Harmon Hall Unit Manager Mark Stoebner knew of Counts's difficulty walking yet refused to move him to the first floor. *Id.*

On September 26, 2020, when Counts was still ill and requested to be seen by medical, Counts was not seen by medical but was informed he had a viral infection and to push fluids. *Id.* ¶ 78. The same events occurred when Counts requested to be seen by medical on September 28, 2020. *Id.* ¶ 80. On October 1, 2020, Counts was seen at medical at Corporal Cropper's demand because Counts was coughing up blood. *Id.* ¶¶ 81–82. Klawitter examined Counts, and Zimmer ordered x-rays; Counts was not provided relief other than the option to buy cough drops at commissary. *Id.* ¶ 82. On October 3, 2020,

Nurse Josephine Pechous[7] denied Count's request to stay in the infirmary. *Id.* ¶ 86; Docket 2 at 28. On October 5, 2020, Nurse Brittney McGrath examined Counts, noting his lungs were "clear but diminished" with his symptoms starting September 21, 2020. Docket 1 ¶ 87. Zimmer also examined Counts, giving him IV fluids and 30 mg of Toradol for pain. *Id.* ¶ 88. Pechous examined Counts on October 6, 2020, noting symptoms of cough, shortness of breath, headache, runny nose, and body aches, but she did not provide treatment. *Id.* ¶ 89. She referred Counts's chart for an advanced provider review. *Id.* An x-ray later in the day revealed that Counts had pneumonia that was not improving. *Id.* ¶ 90. On October 7, 2020, Counts met with McGrath again, who informed him no cultures or tests were ordered and that the provider would review his x-ray and contact him if there were any concerns. *Id.* ¶ 91. On October 8, 2020, Counts was examined by Nurse Tabitha Larsen,[8] and his request to stay in the infirmary was denied. *Id.* ¶ 92. On October 9, 2020, McGrath examined Counts and noticed his condition persisted with his lungs being diminished, but he was not offered any treatment, solely being advised to increase fluids. *Id.* ¶ 93. On October 10, 2020, Neuhalfen examined Counts who still experienced symptoms, but she noted nothing in his chart. *Id.* ¶ 94. Neuhalfen examined Counts the next morning and noted he had wheezing and difficulty inhaling but sent him back to his unit. *Id.* ¶ 95. On October 13, 2020, Counts's x-rays

---

[7] Counts alleges that Pechous's conduct was deliberate indifference, but he does not name her as a defendant in his complaint. *See* Docket 1 at 1, 2–6.
[8] Counts alleges that Larsen's conduct was deliberate indifference, but he does not name her as a defendant in his complaint. *See* Docket 1 at 1, 2–6.

demonstrated "persistent upper lobe pathology I [sic: is] seen. Chest CT may be helpful." *Id.* ¶ 96. *See also* Docket 2 at 51. On October 14, 2020, Counts was examined by Zimmer, who informed Counts that he needed to return to his job, despite his continued illness. Docket 1 ¶ 97; Docket 2 at 52–53. Because he was cleared for work, he alleges that he would not receive earned discharge credits (EDCs) if he did not work. Docket 1 ¶ 98. On October 19, 2020, Counts was x-rayed again, which showed his pathology was resolving. *Id.* ¶ 99; Docket 2 at 54. On October 20, 2020, Nurse Rachel Tycz examined Counts, noted his symptoms, and sent him back to the unit without treatment. Docket 1 ¶ 100.

In October 2020, the MDSP tested all inmates for Covid-19, reporting a 93% infection rate. *Id.* ¶ 102. The few uninfected inmates were moved to Ludeman Hall for isolation. *Id.* ¶ 103. Despite suffering from pneumonia, Counts was placed on the third floor in Ludeman Hall, and Van Osdale denied Counts's request to move him to the first floor, claiming that Hamilton had exclusive control. *Id.* ¶ 105. Counts's room had a hole to the outside making the room unbearably cold, but Van Osdale said nothing could be done because the building was condemned. *Id.* ¶ 106. Fluke, Leidholt, Wasko, and Physical Plant Manager Rob Caruna were aware Ludeman was condemned and did not meet building codes but still allowed the building to be used as an isolation unit. *Id.* ¶ 107.

On October 24, 2020, Counts informed Neuhalfen that his pneumonia was not improving, but she said recovery would take a long time. *Id.* ¶ 108. Counts also informed her of the issues with Ludeman, but Neuhalfen said that

11

housing was a DOC issue not medical. *Id.* On October 29, 2020, after correctional officers took Counts to medical, Pechous examined him for difficulty breathing and notified Zimmer; Counts was sent back to Ludeman without treatment. *Id.* ¶ 109.

On November 4, 2020, Counts tested positive for Covid-19 while he was in isolation. *Id.* ¶ 110. Strom examined Counts and informed Hamilton. *Id.* Despite his positive test, Counts was sent back to his six-man allegedly Covid-free room in Ludeman without treatment. *Id.* Counts was later returned to his second floor room in Harmon, and when Counts complained about the stairs, he was moved to another room on the second floor. *Id.* ¶ 111. On November 5, 2020, Counts was returned to Ludeman. *Id.* ¶ 112. Medical staff allegedly informed Counts that no more Covid testing would be done so the facility would not have to report a 100% infectious rate. *Id.* On November 13, 2020, Counts was moved back to Harmon. *Id.* ¶ 113.

On November 20, 2020, Counts had another x-ray showing new lung infiltrates but was sent back to his unit without treatment. *Id.* ¶ 114; Docket 2 at 68. On November 25, 2020, Fisher examined Counts for shortness of breath and pain, but Counts was returned to his unit without treatment. Docket 1 ¶ 115. On December 8, 2020, Counts's conditions persisted but was not provided any treatment despite his requests. *Id.* ¶ 116. On December 9, 2020, Fejfar examined Counts and listened to the symptoms he described, yet she noted that he had no symptoms, contrary to his complaints and x-ray results. *Id.* ¶ 117. On December 10, 2020, Zimmer examined Counts, and she provided

12

a treatment plan, which Counts alleges included putting kites in for sick call. *Id.* ¶ 118; Docket 2 at 72–77. On December 11, 2020, DeJong responded to Counts's Administrative Remedy request claiming that Counts's treatment was appropriate and that he had agreed to the treatment plan. Docket 1 ¶ 119; Docket 2 at 78. Counts argues that he had no input into the plan and that if he had refused the plan all treatment would have been terminated. Docket 1 ¶ 119. Counts alleges that DeJong falsified a report to conceal the lack of treatment he received. *Id.* ¶ 121; Docket 2 at 78.

On January 8, 2021, McGrath examined Counts noting his symptoms but offered no relief. Docket 1 ¶ 124; Docket 2 at 83–87. On January 12, 2021, Counts was x-rayed, but despite his report finding infiltrates present, Counts received no treatment. Docket 1 ¶ 125; Docket 2 at 88. On January 18, 2021, Counts was taken to see Dr. Pietila, a pulmonologist at the Yankton Medical Clinic (YMC), who advised that Counts "avoid cold weather, smoke, dust, chemicals, and stress, all of which could aggravate [his] condition." Docket 1 ¶ 126; Docket 2 at 89–93. Counts alleges that medical did not attempt to comply with Dr. Pietila's recommendations. Docket 1 ¶ 126.

On January 21, 2021, Counts was taken to the hospital in Tyndall, South Dakota, for a CT scan that showed inflammation in his lung bases: "1 mildly enlarged lymph node adjacent to the aortic arch 13mm short axis, mildly enlarged left hilar lymph node, largest short axis 1cm .17 nodular consolidate extreme left lung bases may be residual infection or inflammatory change warrants follow-up to exclude neoplasm." *Id.* ¶ 127 (quoting Docket 2 at

13

94). But the MDSP medical staff did not provide Counts with any treatment and made no attempts to limit his exposure to potential triggers. *Id.*; Docket 2 at 94. On February 8, 2021, Zimmer examined Counts, who continued to show symptoms, but no treatment was offered. Docket 1 ¶ 128; Docket 2 at 95–98. On February 24, 2021, McGrath examined Counts but offered no treatment. Docket 1 ¶ 129; Docket 2 at 99–102. On April 27, 2021, Counts was taken to Tyndall for a second CT scan that was indeterminate, but no further examinations were scheduled. Docket 1 ¶ 130; Docket 2-1 at 1–2. On May 14, 2021, Counts saw Dr. Pietila, who recommended an echocardiogram and a CT angiogram; Dr. Pietila advised that Counts avoid cold, smoke, and dust. Docket 1 ¶ 131; Docket 2-1 at 3–7. Medical did not follow this advice or list it in Counts's Comprehensive Offender Management System (COMS) to inform DOC staff. Docket 1 ¶ 131. On June 14, 2021, an echocardiogram was performed, but medical staff refused to provide Counts with copies of the report, claiming that would violate Health Insurance Portability and Accountability Act (HIPAA) privacy requirements. *Id.* ¶ 132. But on June 29, 2021, Zimmer and Counts discussed his report. *Id.* ¶ 133; Docket 2-1 at 8–12. Counts and Zimmer discussed how he got dizzy and short of breath, and Zimmer advised him to take breaks at work, not lift over twenty pounds, and not play sports. Docket 1 ¶ 133.

On August 20, 2021, Counts requested a device to track his heart and oxygen rates, as Cardiologist Dr. Irwin recommended, but DeJong said, "monitoring would not be necessary because plaintiff had constant access to

medical personnel." *Id.* ¶ 135. But Counts alleges that access to medical is not full time. *Id.* On August 21, 2021, Counts saw Dr. Irwin, and Dr. Irwin conducted a stress test that Counts was unable to complete due to chest pain. *Id.* ¶ 136; Docket 2-1 at 16. On September 28, 2021, Dr. Irwin recommended Counts receive the Covid booster and pneumonia vaccines, but Tycz said she did not have to follow outside specialists' recommendations. Docket 1 ¶ 137; Docket 2-1 at 18. On October 7, 2021, DeJong informed Counts that "just because the outside specialist orders treatment, it does not mean that Cassie Defenbaugh, Dr. Mary Carpenter in Pierre, or the prison provider will approve it." Docket 1 ¶ 138; Docket 2-1 at 22–23. On October 12, 2021, Counts reported pain, shortness of breath, and dizziness to Zimmer during sick call but was informed that there was no treatment plan in place. Docket 1 ¶ 139; Docket 2-1 at 23.

On October 25, 2021, Nurse Janelle Bastemeyer examined Counts and told him to tell his concerns of coughing up blood to his pulmonologist, and Bastemeyer sent him back to his unit without any further testing. Docket 1 ¶ 140; Docket 2-1 at 28–29. Counts alleges that he was not permitted to contact his pulmonologist. Docket 1 ¶ 140. On November 4, 2021, Dr. Irwin said in a letter to Counts that if symptoms persisted then additional testing was needed, but no additional testing was done. *Id.* ¶ 141; Docket 2-1 at 19. On November 16, 2021, Counts had a video visit with Dr. Pietila, who encouraged Counts "to avoid cold weather and other respiratory triggers, such as smoke, dust, excess humidity, and chemicals[.]" Docket 1 ¶ 142; *see also*

Docket 2-1 at 24–27. Counts told medical of Dr. Pietila's recommendations, but medical staff informed him that he would have to endure discomfort because there was nowhere with air conditioning where his recommendations could be found at MDSP. Docket 1 ¶ 142. Counts alleges that the Sioux Falls Community Work Center would meet Dr. Pietila's recommendations and that he was eligible for trustee status. *Id.*

On December 2, 2021, DeJong examined Counts for trouble breathing, but her only suggestion was not to cough. *Id.* ¶ 143; Docket 2-1 at 30–32. Because medical did not put Dr. Pietila's recommendations into COMS, Counts had to be around chemicals, smoke, dust, and humidity and walk outside in the cold for meals and daily showers. Docket 1 ¶ 143. On December 2, 2021, Zimmer stated, without observing Counts, he had bronchitis and sent him back to his unit without treatment. *Id.* ¶ 144. Counts also had an x-ray, which showed low lung volumes. *Id.* ¶ 145; Docket 2-1 at 35. On December 3, 2021, McGrath saw Counts at sick call, but she did not examine him and sent him back to his unit without treatment. Docket 1 ¶ 146. On December 6, 2021, Counts asked Tycz why he was not given a work order to stay out of the cold, but Tycz said that if he was unable to do his job then he would need to find another job and that "medical would not put recommendations into COMS to require ADA accommodations so permanently or short-term disabled inmates could continue to work." *Id.* ¶ 147; *see also* Docket 2-1 at 36.

On December 8, 2021, DeJong examined Counts, noting his diminished breathing and low lung volumes were due to not taking deep breaths; she sent

him back to his unit without treatment or relief. Docket 1 ¶ 148; Docket 2-1 at 38. On January 24, 2022, Hamilton reported Counts had been placed on winter delivery for medications and meals, which would only occur when the temperature was below negative eighteen degrees. Docket 1 ¶ 149; Docket 2-1 at 39. Counts alleges that winter delivery is activated at thirty degrees. Docket 1 ¶ 149. On January 25, 2022, Counts was required to pay a co-pay or refuse all treatment; Counts paid the co-pay. *Id.* ¶ 150; Docket 2-1 at 53. On January 31, 2022, Fejfar examined Counts, provided him a duo nebulizer, and told him to avoid triggers in his work but would not put the restrictions into COMS. Docket 1 ¶ 151; Docket 2-1 at 57. On February 2, 2022, in response to a first stage grievance filing, Tycz informed staff that Counts was to avoid factors that would exacerbate his condition but did not put that information into COMS. Docket 1 ¶ 152. On the same day, Dr. Irwin's nurse called medical to see if Counts could use a watch to monitor his heart rate and oxygen levels. *Id.* ¶ 153. Tycz told Dr. Irwin's nurse that Counts was closely monitored and had access to medical care 24/7, which Counts alleges is false. *Id.* On February 7, 2022, Fejfar examined Counts, noting that his lung sounds were diminished, but did not provide treatment. *Id.* ¶ 154; Docket 2-1 at 62.

On February 16, 2022, Counts filed a second stage grievance requesting x-rays and that he avoid cold weather, but Schieffer rejected his grievance. Docket 1 ¶ 155; Docket 2-1 at 63. On February 22, 2022, a nurse saw Counts and made a call for an advanced level provider, but the request was refused. Docket 1 ¶ 156; Docket 2-1 at 64–65.

On February 25, 2022, Counts had a telemed appointment with Dr. Pietila, who (1) determined that Counts should avoid smoke, dust, chemicals, cold weather, and excess humidity; (2) prescribed an inhaler with instructions to do additional testing if that did not help; and (3) issued an order for a climate controlled room and placement on a bottom bunk. Docket 1 ¶ 157; Docket 2-1 at 70, 72–73. Counts alleges that Dr. Pietila's room recommendations were followed but not the other recommendations. Docket 1 ¶ 157. On March 7, 2022, medical informed Counts that he would not receive letters from outside physicians and advised that he was not to contact the outside physicians directly; Counts alleges that letters from outside physicians are intercepted and sent to medical under instruction from Special Security Supervisor Lee Kaufenberg and Mail Room Supervisor Carissa Warembourg. *Id.* ¶ 158.

On March 29, 2022, Counts had another video appointment with Dr. Pietila. *Id.* ¶ 159. Medical staff informed Dr. Pietila that Counts's symptoms were improving despite his continued pain, breathing troubles, and other concerns. *Id.* A CT was ordered for September 2022, and Counts was prescribed Singular. *Id.* On April 5, 2022, Counts was taken to medical by a correctional officer over medical's refusal. *Id.* ¶ 160. Stolz examined Counts, and "[a]n e-care consultation with an outside physician resulted in a trip to the emergency room[,]" where Counts was given nitroglycerin. *Id.* Counts returned to prison and his housing unit with no follow-up monitoring. *Id.*; Docket 2-1 at 76.

18

On April 14, 2022, Dr. Wallinga examined Counts, noting that the air conditioned room improved his breathing but he still had difficulties breathing outside. Docket 1 ¶ 161; Docket 2-1 at 81–82. Dr. Wallinga said that he was unable to place Counts's medical restrictions into COMS because of Kaufenberg. Docket 1 ¶ 161. Dr. Wallinga prescribed Isosorbide Nitrate to Counts and set him back to his unit without further relief. *Id.* On April 17, 2022, Counts sent Dr. Wallinga a kite about his chest pain but did not receive a response. *Id.* ¶ 162; Docket 2-1 at 84.

On May 1, 2022, McGrath examined Counts and noted that his oxygen level was at 69% but did not provide supplemental oxygen. Docket 1 ¶ 167; Docket 2-2 at 2. Counts was sent back to his unit without treatment. Docket 1 ¶ 167. On May 3, 2022, Strom saw Counts for respiratory complaints and a lump in his throat; Counts's chart review noted that he should see an advanced level provider. *Id.* ¶ 169; Docket 2-2 at 3–4. On May 12, 2022, DeJong, in response to a first level grievance that Counts was not seen by a doctor for his severe respiratory distress, stated that "its [sic] up to the nursing staff if an inmate gets to see a doctor." Docket 1 ¶ 170; *see also* Docket 2-2 at 11.

On May 12, 2022, Strom saw Counts for chest pain; an EKG was performed, and an appointment was set with the provider. Docket 1 ¶ 171; Docket 2-2 at 13. On May 23, 2022, Counts was taken to Tyndall for a CT scan, which revealed enlargement of his pulmonary artery and no improvement to his lung condition. Docket 1 ¶ 172; Docket 2-2 at 17. On June 1, 2022, a

19

nurse saw Counts and requested a chart review due to Counts's pain in his lungs, but Baker determined without an examination that Counts did not need pain medication. Docket 1 ¶ 173; Docket 2-2 at 19.

On July 18, 2022, Counts went to med pass to pick up his prescription refills, but one prescription was missing, Isosorbide Nitrate, which is an essential medication. Docket 1 ¶ 175. Hamilton said, "it was not her problem." *Id.* Counts reported the situation to a corporal who emailed Fluke. *Id.* The next day, Counts had a headache and chest pain and went to medical. *Id.* ¶ 176. Pechous, Larsen, and Stolz were instructed to administer Isosorbide Nitrate. *Id.*; Docket 2-2 at 22. The Isosorbide Nitrate was at medical all day, but Hamilton instructed that Counts was not to be notified that the medication had arrived. Docket 1 ¶ 176; Docket 2-2 at 21. On July 21, 2023, Counts went to sick call with trouble breathing and other symptoms, but McGrath gave him no treatment. Docket 1 ¶ 177.

On August 5, 2022, DeJong saw Counts at medical for an oximetry test at Dr. Wallinga's request because Counts had requested the addition of benches where inmates could sit and catch their breath. *Id.* ¶ 178. Counts's tests had revealed severe lung damage, but Dr. Wallinga determined that there was no need to install benches. *Id.*; Docket 2-2 at 26. When Counts asked about the result of his oximetry test, DeJong said a visit was unnecessary unless nursing staff ordered it and stated, "that there are no treatments for his lung condition and he would simply have to accept that there may be no cure." Docket 1 ¶ 179; *see also* Docket 2-2 at 27–28.

20

On September 1, 2022, while Dr. Wallinga examined Counts, he discussed Counts's breathing problems, his denial of Counts's request for the issuance of different shoes to prevent pain because shoes are a comfort item, and the grievance Counts filed against DeJong for improper charting. Docket 1 ¶ 180. Dr. Wallinga explained that charting does not include everything to prevent the report from being too long, but Counts "began to seriously wonder whether Wallinga was interested in treatment or only minimizing conditions in order to protect the nurses who failed to properly perform their duties." *Id.* Counts reported Dr. Wallinga to Fluke. *Id.* ¶ 181; Docket 2-2 at 89.

On September 10, 2022, Klawitter saw Counts during sick call and did not provide treatment. Docket 1 ¶ 184; Docket 2-2 at 30–32. Counts alleges he was told that he would not be given a Covid booster in September 2022 until there were enough inmates requesting the vaccine to use a complete vial. Docket 1 ¶ 189; Docket 2-2 at 35. Counts sent a letter to Wasko and Governor Noem describing his medical concerns and the MDSP employees' failure to protect him. Docket 1 ¶¶ 185–186; Docket 2-2 at 33. On September 14, 2020, Counts filed an informal resolution request because medical staff refused to list his environmental triggers in COMS. Docket 1 ¶ 188; Docket 2-2 at 34. On September 20, 2022, DeJong responded to his grievance claiming that the issues were asthma triggers. Docket 1 ¶ 190; Docket 2-2 at 36. On September 22, 2022, Counts was put on Omeprazole because medical staff believed his lung problems were acid reflux. Docket 1 ¶ 191. On October 5, 2022, Counts's prescription for Omeprazole was discontinued; medical staff informed him that

his health issues were because of the types of foods he ordered through commissary. *Id.* ¶ 194. After his removal from Omeprazole, "there were no further plans for treatment of his Chest pain or shortness of breath." *Id.* ¶ 197; *see also* Docket 2-2 at 39.

On October 21, 2022, a provider reviewed Counts's charts and stated no additional restrictions were needed, despite Dr. Pietila informing the MDSP medical staff that Counts should avoid cold, smoke, chemicals, dust, and stress. Docket 1 ¶ 198; Docket 2-2 at 40. On November 3, 2022, Counts received correspondence that said he should use inhalers and prescriptions in response to a kite about his conditions, but no examination was done. Docket 1 ¶ 200; Docket 2-2 at 43.

Counts was on medical lay-in trays, but Tjeerdsma said that lay-in trays would be delivered only when the temperature was below negative eighteen degrees. Docket 1 ¶ 201. Another inmate with the same lung condition as Counts was placed back on lay-in meals, but Counts was denied lay-in meals. *Id.* ¶ 206. Counts alleges this was retaliation. *Id.* Tjeerdsma and Fejfar both informed Counts that his special treatment would stop. *Id.* ¶¶ 218, 220. When it was negative twenty-eight degrees wind chill, all medications except Counts's self-meds were delivered. *Id.* ¶ 230.

On November 17, 2022, Tycz examined Counts noting his symptoms but did not provide treatment. *Id.* ¶ 202. Counts filed a grievance for Tycz's failure to treat him. *Id.* ¶ 203. Tjeerdsma told Counts to stop the complaints or "who

knows where plaintiff will end up." *Id.* Counts stopped filing grievances in fear of retaliatory transfer. *Id.*

Counts alleges several occurrences where smoke from the sweat lodge wood fire and MDSP Maintenance Department's burn pit caused him respiratory irritation. *Id.* ¶¶ 210, 212, 310, 315, 433; Docket 17 at 8. On December 9, 2022, Counts met with Dr. Wallinga about his condition and asked for a portable nebulizer, which Dr. Wallinga denied because they were too expensive and not covered by insurance. Docket 1 ¶ 216. Counts said that they would be paid for by the DOC because his health condition arose while in DOC custody, but Dr. Wallinga said "It's tax money and I pay taxes" before sending Counts back to his unit without treatment. *Id.*

Counts sought advice from medical about what employment he could have because of his medical condition. *Id.* ¶ 209. Counts was discouraged from working with paint chemicals, but DeJong refused to put his triggers in COMS, claiming they "are all possible triggers not medical restrictions." *Id.* ¶¶ 209, 213; Docket 2-2 at 50. Counts contacted Fluke about this concern, but Fluke replied that he "was told that [Counts's] UM has been in contact with [Counts] regarding this topic." Docket 1 ¶ 211.

Counts had a blood test that indicated a pulmonary embolism. *Id.* ¶ 236. On January 2–5, 2023, Counts was hospitalized at the Tyndall hospital and diagnosed with "pulmonary embolus exacerbation of COPD and acute dyspnea[,]" which Counts alleges the complications could have been reduced had Paul, Dr. Wallinga, DeJong, Klawitter, or Bastemeyer looked at the blood

results. *Id.* ¶¶ 237–238. Hospital discharge papers instructed to quarantine Counts, but medical staff denied him lay-in meals. *Id.* ¶ 239; Docket 2-2 at 77.

DeJong, Tycz, Reyes, Tjeerdsma, and Dr. Wallinga held a care conference where they determined that if Counts refused or did not attend morning med pass to receive his new blood thinner, then he would be placed in the Special Housing Unit (SHU), which Count's alleges is only for court-ordered psychotropics. Docket 1 ¶ 240. Hamilton told Counts to stop filing "childish things" like his complaint to the Board of Nursing. *Id.* ¶ 241. When Counts went to shower at medical on January 13, 2023, Bastemeyer blocked his path, stepping in front of his wheelchair, and informed him that he " 'better not' talk to her or look at her if he knew what was good for him . . . . 'Don't worry, medical knows what you're up to. Your medical care will be real good now.' " *Id.* ¶ 246. Counts filed a grievance about Bastemeyer's conduct, but a safety solution was declined. *Id.* ¶ 247. Counts also filed an administrative remedy about Bastemeyer's conduct. *Id.* ¶ 250; Docket 2-2 at 97.

On January 11, 2023, Counts went to sick call for respiratory concerns, but he was sent back to his unit without treatment. *Id.* ¶ 243. On February 10, 2023, Dr. Aaron Haynes cancelled Counts's MRI appointment and denied further appointments with Dr. Pietila because they were "unnecessary." *Id.* ¶ 254. Haynes said he did not have to follow specialists' recommendations and cancelled Counts's CT scan. *Id.* ¶ 255. Counts told Tycz that he would refuse his blood thinner if medical would not follow his doctor's orders, but

24

Kaufenberg sent unit staff an email saying that Counts would be thrown in SHU if he refused a dose. *Id.* ¶ 256.

Counts had been prescribed Tylenol for two years as his sole pain medication, but in February 2023, he was notified that the policy changed and that he would need to purchase Tylenol through commissary. *Id.* ¶ 259. Counts alleges that this change was retaliatory because other inmates renewed Tylenol prescriptions after his was denied. *Id.*

On March 12, 2023, Stolz examined Counts noting he experienced several problematic symptoms, but Counts was not seen by a physician. Docket 12 ¶ 20; Docket 12-1 at 1–4. Stolz amended her report to state that Counts refused to be tested for Covid, which he alleges he did not do. Docket 12 ¶ 20. He alleges that it "is highly specious [sic] that records keep getting changed in [his] file, days after he has been seen, it appears that medical at Mike Durfee State Prison is trying very hard to cover things up." *Id.*

On March 19, 2023, Counts tested positive for Covid, was given a shot of Toradol for pain, and was taken to isolation where he passed out for three hours. Docket 1 ¶ 314. Upon waking, he was rushed to medical a quarter mile away and then taken to the Tyndall hospital. *Id.*; Docket 2-2 at 80–81. On March 28, 2023, Counts was required to walk to medical by himself in his dizzy state where he was examined by Baker. Docket 1 ¶ 315.

Counts sent a request to medical that "hurt their feelings[,]" and as of June 21, 2023, Unit Manager Deb Eilers required that Counts send his medical requests to her first for approval. *Id.* ¶ 444. Counts alleges this violates the

DOC policy and HIPAA by requiring him to disclose this information to a security officer. *Id.*

On October 6, 2023, Counts was moved to the MDSP barracks, which is a Morton garage that was transferred into a living facility. Docket 18 ¶ 6. Eilers informed Counts that the instruction for his move came from the wardens, despite their knowledge of his condition and the conditions of the barracks. *Id.* ¶ 7. The barracks is further from health services and defibrillator machines, lacks air conditioning during spring and fall months, is dusty due to the forced air system without a filter, has tape over the exhaust fans, has bug spray in the air constantly because of all the bed bugs, and is closer to the burn pit compared to his prior residence. *Id.* ¶¶ 8–9. Eilers told Counts that "maybe [he] should not try and always buck the system, leading [him] to draw the conclusion that he was being moved due to retaliation." *Id.* ¶ 7. Counts has since been transferred from the MDSP to the SDSP.

Counts alleges that when he filed his complaint he was prescribed seven medications. Docket 1 ¶ 214. Counts claims that due to the defendants' actions he now suffers from COPD and Reactive Airway Syndrome. *Id.* ¶¶ 263– 264.

### c.    Leg Injury

On December 17, 2022, Counts injured his leg and requested to go to medical, but because medical was busy, he was not seen until December 18, 2022. *Id.* ¶ 221. Bastemeyer determined Counts did not have a blood clot and sent him back to his unit, denying his request for a wheelchair. *Id.* Strom

26

examined Counts on December 19, 2022, and he was referred to PA Elizabeth Paul. *Id.* ¶ 222; Docket 2-2 at 53. Paul denied Counts's request for crutches or a wheelchair without examining him. Docket 1 ¶ 223.

Tjeerdsma yelled at Counts for using a wheelchair without permission. *Id.* ¶ 224. He stated that Counts could use a wheelchair to get to medical but if medical did not issue a wheelchair, then Counts would have to figure it out. *Id.* On December 21, 2022, Tycz allowed Counts to use crutches but not a wheelchair. *Id.* ¶ 225. On December 28, 2022, after Counts walked to medical on crutches, he fell at the doorway, hitting his right knee, right shoulder, and head. *Id.* ¶ 232. Dr. Wallinga told Counts he had a torn meniscus and should have been in a wheelchair since day one. *Id.* ¶ 233. Counts alleges the defendants were deliberately indifferent to his medical needs. *Id.*

### d.   Shower Injury

On June 24, 2023, Counts was working in West Crawford Hall, when he "was shocked and knocked down by the light in the shower." Docket 12 ¶ 25. Counts alleges that the light used was not waterproof, which caused water to fill up and leak from the light. *Id.* Counts followed maintenance's instructions and used a rag to drain the water out, but Counts was shocked, knocked down, and lost consciousness. *Id.* The light was replaced with another household light, but Eilers alleged that maintenance was working on getting a waterproof light. *Id.* Another shower had the same issue, and the light was removed completely, providing no light in that shower. *Id.*

## 2.    Americans with Disabilities Act

Counts worked with the electrical training program for the MDSP Governor's Housing Project. Docket 1 ¶ 58. Counts's work was part of a training class that helped him earn licensure and earned discharge credits (EDCs). *Id.* Tony Shelburg was the supervisor of the South Dakota Housing Authority electrician program. *Id.* ¶ 134. The classroom instructor was Jordan Parsons, who was in the program for six months prior to Counts starting. *Id.* ¶ 267. Counts alleges that Shelburg permitted Parsons without proper licensure to join the class and lead other inmates. *Id.* ¶¶ 268–269.

As part of his work, Counts regularly carried wiring spools weighing up to seventy-five pounds. *Id.* ¶ 58. In June 2021, due to his medical condition, Counts was placed on restrictions limiting his lifting to no more than twenty pounds, requiring him to take frequent breaks, and encouraging him to work inside as much as possible. *Id.* ¶ 133. Shelburg was informed of Counts's medical restrictions and contacted his superior in Pierre, who said that Counts had to work to stay in the class. *Id.* ¶¶ 134, 272. Parsons terminated Counts from the electrician program because he "was tired of plaintiff taking frequent breaks and the weight restrictions[.]" *Id.* ¶ 273. Counts informed Shelburg and was told to go work on the finish crew. *Id.* ¶ 274. After an hour of working with the finish crew, Shelburg told Counts that "because of his disabilities and not being able to keep up with his crew, he would be terminated from work and school," which Counts alleges violates DOC policy. *Id.* ¶ 275; Docket 3 at 27.

The Governor's Housing Project policy states "[i]f you are marked light duty (AKA) disabled, you will be fired, as all inmates are expected to perform manual labor." Docket 1 ¶ 304. Counts alleges that he was terminated for medical restrictions and was not listed as disabled. *Id.* ¶ 305. On April 15, 2023, Counts met with Tammy Doyle about his inability to find work because his medical restrictions were not in COMS, and she informed him that if "all of his restrictions were properly entered into COMS, plaintiff would be considered totally disabled and the prison would be obligated to give plaintiff Earned Discharge credits for every years [sic] he was unable to work or attend class, which would directly impact plaintiff's parole and final discharge dates." *Id.* ¶ 318.

Counts kited Tammy Doyle asking for help finding appropriate employment due to his lung condition. *Id.* ¶ 307. She replied that he would be listed as disabled and that "all inmates with disabilities are given equal rights to work and class, whether mandatory or voluntary." *Id.* ¶ 308. Counts applied for other employment, including employment in a controlled environment, but has been refused for all positions. *Id.* ¶ 309. Counts alleges that "[t]he DOC claims to have accommodated his condition by employing him as a bathroom runner, but this exposes him to the cleaning chemicals used and the humidity from the inadequately vented showers." *Id.* ¶ 438.

Counts wrote multiple letters to DOC AD Director Brittney Lengkeek, Fluke, Wasko, and Governor Noem seeking reasonable accommodations to continue in the South Dakota Housing Project electrician program. *Id.* ¶¶ 277–

280. Counts alleges in the letters that the DOC facilities did not meet required standards for compliance with the Americans with Disabilities Act (ADA). *Id.* ¶ 281. Counts filed reasonable accommodation requests seeking installation of automatic doors for wheelchairs in all MDSP buildings, seeking installation of a ramp for the medical building, seeking access to the med line, requesting installation of handrails, complaining about the absence of benches, seeking an air filtration system, requesting air conditioning in the welding and automotive areas, asking to be placed in a CBISA class, requesting medical assistance for application of his "Adalapene" cream, requesting a heart monitor, and an unspecified request. *Id.* ¶¶ 282–303, 321. All requests were denied. *Id.*

### 3. Sanitation

#### a. Tunnels

Counts alleges he was required to go into the steam tunnels under West Crawford to identify a water leak. Docket 17 at 3. In the tunnels, there was black mold, smell of ammonia and rotten eggs, signs listing "Danger! Asbestos!", spider webs, rats, frogs, garter snakes, electrical wires in standing water, and empty beer cans. *Id.* Counts alleges that "[a]ll of the toxic chemicals, mold smells, and rancid water vapors from the tunnels come up into the housing units through the open stairwells and are sucked down the hallways by the exhaust fans, entering the rooms of all inmates." *Id.* at 4. Counts claims that Eilers is aware of the fumes that come from the stairwell and impact his

breathing, but "Eilers has done nothing to ameliorate these conditions." Docket 16 ¶ 6.

### b.     Vermin

Counts claims that the Dietary Building at the prison has an insect and rodent problem. Docket 1 ¶ 330. He alleges that the Dietary Building's lack of cleanliness has "increased the level of fly and other insect infestations by essentially leaving them a pathway into the building where food is served and eaten." *Id.* ¶ 337. The overhead doors are frequently left open, which allows birds, insects, and rodents to enter the dining hall. *Id.* ¶ 346. Counts raised the problem of sanitation with Kim Halverson, Kitchen Supervisor for Summit Food Service and later Aramark Food Services. *Id.* ¶¶ 18, 330. "Halverson's response to his concerns was that she would not exceed her self-imposed budget[9] to control vermin infesting the food because it's 'going to happen everyday anyway.' " *Id.* ¶ 330. Counts alleges that the Department of Health provide three days warning to Wasko,[10] Fluke, Reyes, Schieffer, Schryvers, and other senior staff prior to inspection, which allows conditions to be made acceptable while the inspector is present, or the inspector ignores health code violations. *Id.* ¶¶ 338, 356.

---

[9] Counts alleges that Halverson imposed a budget of $0.29 per diet tray, but the DOC is charged roughly $1.68 for main line meals. Docket 1 ¶ 329.
[10] Counts claims that several secretaries of corrections received notification, but the only secretary of corrections named as a defendant is Kellie Wasko. Docket 1 ¶ 6. Counts states that Mike Leidholt and Tim Reisch served as department secretaries, but he does not name them as defendants. *Id.*

Counts also alleges that day hall doors are kept open for circulation, which allows vermin to blow through the halls, including flies, mosquitoes, feral cats, ground squirrels, snakes, frogs, toads, and lizards. *Id.* ¶¶ 434–435. Counts also alleges he "has seen mouse traps set by maintenance personnel in several rooms, complete with mummified corpses because the traps are not checked." *Id.* ¶ 436.

### c.      Floors of Dietary Building

Counts claims that the floors in the Dietary Building are filthy and unsanitary. *Id.* ¶ 335. He claims that the floors were originally light grey but are now black and sticky. *Id.* He alleges that the floors cannot be mopped clean because of the extent of the problem and that attempting to clean one small area of the floor proved fruitless even after changing the mop water ten times. *Id.* ¶ 336.

### d.      Air Handling System

Counts claims that the primary air handling system in the Dietary Building and housing units are inadequate. *Id.* ¶¶ 343, 427. He claims that there is no air filtration, resulting in visible lint, dust, and hair in the air. *Id.* ¶ 343. He also claims that the system contains inflatable ducts that deflate when the system shuts down due to a fire alarm, and the ducts reinflate and send lint, dust, and hair into the air when the alarm is cleared. *Id.* Counts alleges that the system does not have climate control and that doors to the building are opened while fans blow through the building, exacerbating the problem. *Id.* ¶ 344. He alleges that the secondary air handling system consists

32

of only a few exhaust fans and wall mounted fans that do not solve the problem. *Id.* ¶¶ 343–345. He acknowledges that the serving area has an air conditioning system but claims that it has little or no filtration, resulting in dust, lint, and hair on all high surfaces. *Id.* Counts alleges that the failure to filter air contributes to the spread of disease and endangers the lives of incarcerated prisoners. *Id.* ¶ 348.

Counts alleges that East and West Crawford and Harmon housing units have no central air system. *Id.* ¶ 429. Counts claims a handful of rooms in each building have added window air conditioning units for inmates with medical conditions. *Id.* ¶ 430. But there is no air filtration other than the window air conditioner itself. *Id.* ¶¶ 431–432. Counts alleges that "[t]here are no air filtration systems in any of the living quarters at Mike Durfee State Prison which can accommodate plaintiff's reactive airway disease and COPD." *Id.* ¶ 437. Counts was exposed to unfiltered, contaminated air every time he left his room. *Id.* ¶¶ 437–439.

### e.    Utensils and Tables

Counts claims that the utensils and tables in the Dietary Building are unsanitary and go uncleaned. *Id.* ¶ 355. He claims that the aluminum tables are made up of grooved planks, which allows for food and drink particles to build up between the planks and in the grooves. *Id.* ¶ 349. He alleges that the tables have been unsanitary for years and cannot be removed and sprayed down without disassembling them entirely. *Id.* ¶ 352. He claims that the tables are cleaned by dining hall workers with a slop rag and mild bleach, but there is

no supervision, with workers washing several tables before rinsing their rags. *Id.* ¶ 351. Clean utensils have food particles and stains on them, which could be prevented if the prison used better cleaning and dishwashing procedures. *Id.* ¶ 355.

### 4.    Kitchen Employment and Nutrition

Counts began working in the MDSP kitchen in December 2022 but was terminated due to a write-up. *Id.* ¶¶ 208, 327, 332. Counts's job was to order food for and to prepare Kosher diet trays. *Id.* ¶ 327. Halverson told Counts "to keep food costs low and to make the Kosher diets worse so inmates would go back to the regular meals." *Id.* Counts was told to ignore the menu and make food that did not meet the calorie count or nutrition requirements "because no one ever looks at the kitchen and the State will protect [Halverson] from any questions." *Id.* ¶ 332. Counts alleges that diet trays often include substitutions of items that are not of equivalent nutritional values. *Id.* ¶ 357. When Counts reported the health and nutrition concerns to staff, the staff concluded that Summit and Aramark are outside their control and that nothing could be done. *Id.* ¶ 333.

### 5.    Computer Use

#### a.    Limitation of Typed Documents

Counts alleges that Officer Wilson implemented a policy permitting only motions and pleadings to be typed, requiring letters to counsel and state agencies or officials to be handwritten. *Id.* ¶¶ 363–364. Counts alleges he had a "joke indictment" of Tjeerdsma in his printed work, and Wilson wrote him up.

*Id.* ¶ 365. But Counts claims that prison staff are only allowed to verify the caption and that the typist is the subject of the document and not the contents of the documents. *Id.*

Counts claims that permitting prisoners only to type documents in the typing room decreases coordination among inmates doing legal work, which Counts alleges is the DOC's goal. *Id.* ¶ 368. If an inmate wants to provide an affidavit to support another inmate's claims, the affiant must take a day off work, losing wages, and essentially delaying his parole. *Id.* ¶ 367.

On July 5, 2023, another inmate printed legal work that included Counts's papers. Docket 12 ¶ 25; Docket 17 at 6. Counts founds that a keystroke detector was installed on the computers and that printing saved all documents to an "S" drive, which Counts alleges interferes with legal work and is a constitutional violation. Docket 17 at 7. "Based on the keystroke detector and the files of inmate legal work," Counts alleges "there is an intentional, officially sanctioned pattern of behavior intended to interfere with inmates' legal access." *Id.*

### b.    Technology Charges

Counts claims that prison staff have implemented policies regarding computer use for legal research and filings that have restricted his access to the courts. Docket 1 ¶¶ 360–378. He claims that the prison charges five cents per printed page and that this was reduced from twenty-five cents. *Id.* ¶¶ 372, 375. Counts alleges that the DOC policy only provides for charging for photocopies, not printing, and that the SDSP does not charge for printing. *Id.*

¶ 375. Counts alleges the printing charges subject inmates at MDSP to a penalty for accessing the courts. *Id.* ¶ 377. Counts also claims that, prior to the elimination of the contract attorney, all original legal work was free and copies were paid for as part of the contract. *Id.* ¶ 378.

Counts also alleges that prisoners are charged for using tablet services that are free to the general public. Docket 18 ¶ 5. Counts claims that Sony Crackle and Pluto charge inmates ".05 cents per minute" of use, which Counts alleges is an extra consequence for an inmate trying to learn new skills. *Id.*

### c.      Overdrawn Balance Policy

Counts alleges that inmates are allowed to go in debt up to $2.00 for copies and that indigent inmates are allowed only forty copies per month. Docket 1 ¶ 373. Counts claims this policy is to deter inmates from filing legal pleadings because, prior to the decrease in printing charges, prisoners were allowed to go $10.00 in debt. *Id.* ¶ 374.

### d.      Prisoner Trust Account Report Charges

He also claims that, as per DOC policy, inmates are charged fifty cents per prisoner trust account report, even though individual pages are only five cents. *See id.* ¶ 397. He alleges that twelve sheets of paper have cost him three dollars because of this policy, rather than the sixty cents it would be at five cents a page. *Id.*

### 6.      Tablet Use

Counts claims that the DOC provides inmates with access to legal research through GTL tablets equipped with LexisNexis and that these tablets

36

have issues that prevent inmates from performing legal research. *Id.* ¶ 312. He alleges that the law library was destroyed because of the tablets, and as a result inmates are prevented from consulting with each other when drafting legal documents. *Id.* ¶¶ 379–380. Counts claims that inmates are provided no training about how to research on LexisNexis and that the app is "virtually useless to him[.]" *Id.* ¶ 384. Counts also claims that the app frequently has issues with connectivity, speed, and access. *Id.* ¶¶ 386–387. He claims that Lexis is nearly impossible to read on the tablet and that once during updates only a limited number of old tablets were available because of improper functioning on new tablets. *Id.* ¶ 390.

Counts also claims that the tablets do not work in the typing room because the network is not available there. *Id.* ¶ 393. Counts and other inmates have suggested to wardens and senior staff that access to Lexis should be available in the typing room, but the idea has been rejected. *Id.* ¶ 394. Counts alleges that GTL Technology replaced LexisNexis with Westlaw on research tablets, which "is now limiting [Counts] to a system that is harder to use [and] has limited accesses." Docket 18 ¶ 4.

### 7.   Mail Restrictions

Counts alleges he wrote ten letters to Governor Noem about his civil rights violations and other concerns about the MDSP, but only one letter was received. Docket 1 ¶¶ 174, 181, 185–186, 214, 242, 248, 277; Docket 2-2 at 29; Docket 12 ¶¶ 2–8; Docket 16 ¶ 30. He also wrote Wasko thirteen times. Docket 1 ¶ 165, 174, 181, 185–186, 192–193, 208, 277; Docket 2-2 at 29;

Docket 16 ¶ 31. Counts alleges that he entrusted his legal mail to Warembourg, but it failed to reach its destination on multiple occasions. Docket 16 ¶ 33; Docket 17 at 15–19. Unit Coordinator Van Osdale told Counts that he was instructed to slow legal processes of an inmate in room W125, which was Counts's room. Docket 17 at 1. When Counts attempted to send out legal mail, Van Osdale sealed the envelope and placed it in Unit Manager Deb Eiler's office, which was not the usual practice or policy. *Id.*

Counts also alleges that DOC Staff Attorney Addyson Aguirre decided that Counts is no longer able to, as permitted under prison policy, use commissary slips to pay for legal mail once he exceeds the monthly $15.00 allowance. Docket 16 ¶¶ 2, 14–20; Docket 17 at 10. Eilers said that the policy had not changed and that the rule was specifically for Counts. Docket 17 at 10.

### 8.    Overcrowding and Understaffing

Counts claims that the prison is overcrowded and understaffed, resulting in dangerous conditions. Docket 1 ¶¶ 399–425. He claims that one housing unit has been shut down and that classes, worksites, and recreational activities are often cancelled because of insufficient staff numbers. *Id.* ¶¶ 405–406. He also claims that a fight in the Dietary Building lasted for over two minutes because the minimal number of staff members present failed to notice it. *Id.* ¶ 409. He alleges that, after the fight, there were only three officers present to cover two units with 440 inmates. *Id.* He claims that housing units are operating well above design capacity and that staff fail to supervise medication distribution lines. *Id.* ¶¶ 405–406, 423.

38

Counts alleges that due to the staffing shortages officers at times have been unable to do required safety rounds or security shakedowns. *Id.* ¶¶ 409–411. Counts alleges that because of the staff shortage staff are left alone on units with inadequate training. *Id.* ¶ 412. He claims to have seen officers that are so new they have difficulty with count sheets when left alone to monitor a unit. *Id.* "Staff work without adequate training just to have bodies in uniform on site." *Id.* Officers ignore prohibited activity such as gang signs, gambling, extortion, tattooing, and visiting wrong housing units. *Id.* ¶ 415.

### 9. Religious Restrictions

Counts claims that the defendants have denied him his right to practice his religion because church services and community togetherness have been cancelled due to prison staffing shortages. *Id.* ¶ 311. Counts submitted requests for an administrative remedy because he was denied his right to practice his religion due to the cancellation. Docket 3 at 71, 73. Tiffany Voigt and Fluke responded to his requests informing him that the cancellations were due to staff shortages but that he was free to practice his religion individually in his room. *Id.* at 70, 72. Counts brings this claim against Wasko, Fluke, and Voigt. Docket 1 ¶ 311; *see also* Docket 1 at 130.

### 10. General Requests for Relief

Counts sues Wasko in her individual and official capacity for violating his First, Fifth, Eighth, and Fourteenth Amendment rights and under the ADA for her inability to staff, train, or supervise the SD DOC. *Id.* ¶ 445. Counts requests the following relief from Wasko in her individual capacity:

(1) $1,000,000.00 in compensatory damages for lifetime earnings potential;
(2) $1,000,000.00 in compensatory damages for denial of religious services, security threats, loss of programming, and required treatment because of her failure to properly train staff and protect Counts; (3) $1.00 in nominal damages; and (4) $10,000,000.00 in punitive damages. *Id.* at 129–30. Counts requests the following relief from Wasko in her official capacity: (1) place Counts in a facility or home confinement suitable for his medical conditions; (2) provide Counts with outside specialists during his incarceration; (3) award 360 days of EDC for credits lost due to termination from governor housing project; (4) award 180 days of EDC for denial of welding and automotive classes; (5) award 270 days of EDC per year because the DOC did not provide classes or work compatible with Counts's disability; (6) grant full medical coverage until Counts reaches age 65; (7) require DOC to bring all facilities into compliance with the ADA; (8) stop all federal funding to the DOC until substantial compliance with ADA regulations; (9) require staff in DOC facilities to wear a body microphone, with the recordings being saved for three years; (10) require training and assistance for inmates to have legal typing and to permit inmates to help other inmates with typing; (11) supervise Aramark's meal service; (12) conduct surprise inspections by the Department of Health; (13) require all DOC facilities be equipped with air handling systems and air-conditioning; (14) require DOC to give every inmate treatment for required classes on their IPD without delay; and (15) stop all federal funds to SD DOC until they come into compliance with treatment for classes. *Id.* at 130–32.

40

Counts sues Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, and Stoeber in their individual and official capacities for violating or conspiring to violate his First, Fifth, Eighth, and Fourteenth Amendment rights and under the ADA. *Id.* ¶ 446. Counts requests the following relief against these defendants in their individual capacities: (1) compensatory damages of $100,000.00 from each defendant; (2) nominal damages of $1.00; and (3) punitive damages of $10,000,000.00 from each defendant. *Id.* at 133. Counts requests the following relief against these defendants in their official capacities: (1) bar these defendants from sanctioning Counts for providing full documentation of alleged incidents to KSFY News, KELO News, or the Argus Leader; (2) require compliance with the ADA and SD Humans Rights Act of 1972 under supervision of the Department of Justice; (3) require Voigt to follow all DOC rules and regulations and not slow legal process for inmates; (4) require Fluke and Reyes to walk through all MDSP buildings at least three days per week to inspect the facility and gather inmate and staff concerns; (5) require Caruna to inspect all buildings and make needed repairs; and (6) require all unit managers to follow all DOC rules and ADA regulations. *Id.* at 133–34.

Counts sues Shelburg for ADA violations due to his termination of Counts from work and class because of his disability. *Id.* ¶ 447. Counts requests the following relief from Shelburg in his individual capacity: (1) compensatory damages of $100,000.00; (2) nominal damages of $1.00; and (3) punitive damages of $100,000.00. *Id.* at 134. Counts requests the following

41

relief from Shelburg in his official capacity: (1) train Shelburg regarding the ADA compliance standards; (2) supervise job sites daily when inmates are present; (3) stop federal funding to SD Governor's Housing Project until compliance with ADA standards and proper training; and (4) require the SD lead electrical inspector to inspect the Governor's Housing Project electrical department and plans to provide a report of compliance. *Id.* at 134–35.

Counts sues Halverson for violating his rights by failing to provide a safe and healthy diet in a clean facility under the Summit/Aramark contracts and for harassment and termination without cause. *Id.* ¶ 448. Counts requests the following relief from Halverson in her individual capacity: (1) $100,000.00 in compensatory damages for wrongful termination; (2) $1.00 in nominal damages; and (3) $100,000.00 in punitive damages. *Id.* at 135. Counts requests the following relief from Halverson in her official capacity: (1) train Halverson regarding commercial food preparation standards; (2) train Halverson regarding kosher food preparation standards; (3) mandate Halverson to comply with contractual obligations between the DOC and Aramark, and any successor company; (4) mandate Halverson to participate in diversity training; and (5) mandate that Aramark comply with all kosher food regulations. *Id.*

Counts sues Wilson in her individual and official capacity for violating or conspiring to violate his First, Fifth, and Fourteenth Amendment rights. *Id.* ¶ 449. Counts requests the following relief from Wilson in her individual capacity: (1) compensatory damages of $1,000.00; (2) nominal damages of $1.00; and (3) punitive damages of $1,000.00. *Id.* at 134. Counts requests relief

42

in Wilson's official capacity to train her in administration of legal access policies. *Id.*

Counts sues Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, and Strom in their individual and official capacities for violating or conspiring to violate his Eighth, Ninth, and Fourteenth Amendment rights. *Id.* ¶ 450; Docket 12 ¶¶ 13, 18. Counts requests the following relief from these defendants in their individual capacities: (1) $100,000.00 in compensatory damages from each defendant; (2) $1.00 in nominal damages; and (3) $1,000,000.00 in punitive damages from each defendant. Docket 1 at 132. Counts requests the following relief from each of these defendants in their official capacities: (1) require Bastemeyer and Tycz to take anger management training and (2) suspend Bastemeyer and Tycz from nursing until anger management classes are completed and proof has been submitted to the court. *Id.*

Counts sues Governor Noem in her official and individual capacity. Docket 12 ¶ 9. Counts request the following relief from Governor Noem: (1) $1,000,000.00 in compensatory damages; (2) $1.00 in nominal damages; (3) $10,000,000.00 in punitive damages; (4) transfer Counts to a facility that meets his medical needs; (5) stop federal funding of the DOC until it complies with federal BOP standards for inmate care; and (6) stop burning chemicals on prison property and set up a prison recycling program and chemical disposal service. *Id.* ¶¶ 10–12.

Counts sues Strom, Stolz, and Gebes in their individual and official capacities for violating or conspiring to violate his Eighth, Ninth, and Fourteenth Amendment rights. *Id.* ¶¶ 13–14, 18; Docket 1 ¶ 450. Counts requests the following relief in their individual and official capacities: (1) $100,000.00 in compensatory damages; (2) $1.00 in nominal damages; and (3) $1,000,000.00 in punitive damages from each defendant. Docket 12 ¶¶ 14–16. Counts requests injunctive relief barring these defendants from providing him medical treatment and placing letters in their licensure file. *Id.* ¶ 17.

Counts sues Eilers in her individual and official capacities for violation of his First, Eighth, Ninth, and Fourteenth Amendment rights. Docket 16 ¶¶ 1, 7. Counts requests the following relief from Eilers in her individual capacity: (1) $1,000,000.00 in compensatory damages; (2) $1.00 in nominal damages; and (3) $1,000,000.00 in punitive damages. *Id.* ¶¶ 9–11. Counts requests the following injunctive relief against Eilers: (1) require Eilers to comply with all relevant DOC rules, policies, operations, memoranda, and regulations; (2) require Eilers to complete building inspection and maintenance course; (3) require Eilers and her successors to cease interference with Count's legal mail; and (4) require Eilers to be instructed on legal mail policies. *Id.* ¶ 12.

Counts sues Aguirre in her individual and official capacities for violation of his First, Fifth, Eighth, Ninth, and Fourteenth Amendment rights. *Id.* ¶¶ 15–16. Counts requests the following relief against Aguirre: (1) $1,000,000.00 in punitive damages for failure to properly advise the DOC, for sanctioning DOC staff to slow his mail, and for authorizing DOC to single out Counts for

retaliation; (2) $1,000,000.00 in punitive damages for violation and conspiracy to violate Count's rights to medical treatment and access to the courts; (3) $1.00 in nominal damages; and (4) refer Aguirre to the South Dakota State Bar for investigation into her conduct as staff attorney for the DOC. *Id.* ¶¶ 21–24.

Counts sues Warembourg in her individual and official capacities for violation of his First, Fifth, Sixth, Ninth, and Fourteenth Amendment rights. *Id.* ¶¶ 27–28. Counts requests the following relief against Warembourg: (1) $10,000.00 in compensatory damages; (2) $1,000,000.00 in punitive damages; (3) $1.00 in nominal damages; (4) require her to complete a course in inmates' retained constitutional rights; and (5) require her to comply with all relevant DOC rules, policies, operational memoranda, and regulations. *Id.* ¶¶ 34–37.

Counts sues Lippincott in her individual and official capacities for violating or conspiring to violate his First, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *Id.* ¶¶ 40–41. Counts requests the following relief against Lippincott: (1) $1,000,000.00 in compensatory damages; (2) $1,000,000.00 in punitive damages; (3) $1.00 in nominal damages; and (4) injunctive relief requiring Lippincott to comply with all relevant DOC rules, policies, operational memoranda, and regulations. *Id.* ¶¶ 43–46.

Count sues GTL Technology in its individual and official capacities. Docket 18 ¶ 2. Counts requests the following relief against GTL Technology:

(1) $10,000.00 in compensatory damages, (2) $1.00 in nominal damages, and (3) $10,000.00 in punitive damages. *Id.* at 4.

### B.    Legal Background

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Pro se and civil rights complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004) (citation omitted). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013) (per curiam) (citation omitted).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). If it does not contain these bare essentials, dismissal is appropriate. *See Beavers v. Lockhart*, 755 F.2d 657, 663–64 (8th Cir. 1985) (citation omitted) (explaining that a district court does not err when it dismisses a claim based on vague allegations or unsupported generalizations). *Twombly* requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true[.]" 550 U.S. at 555 (internal citation and footnote omitted); *see also Abdullah v. Minnesota*,

46

261 F. App'x 926, 927 (8th Cir. 2008) (per curiam) (noting that a "complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory" (citing *Twombly*, 550 U.S. at 554–63)).

Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The court will now screen Counts's complaint under 28 U.S.C. § 1915A.

## C.    Legal Analysis

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

*Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up). Count's individual capacity claims must allege that each individual defendant either participated in the unconstitutional conduct or caused the conduct to occur through a failure to train or supervise the offending actor.

47

### 1.    Official Capacity Claims for Money Damages

Counts brings claims against Governor Noem, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott requesting money damages in their official capacities. Docket 12; Docket 16. These defendants are employees of the state of South Dakota. *See id.* "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* The state of South Dakota has not waived its sovereign immunity. Thus, Count's claims for money damages against Governor Noem, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott in their official capacities are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### 2.    Claims for Injunctive Relief

The Eighth Circuit has held that "an inmate's claims for declaratory and injunctive relief to improve prison conditions were moot when he was transferred to another facility and no longer subject to those conditions." *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999). Counts has been transferred

48

from the MDSP to the SDSP. Docket 19. Counts alleges that the following defendants are employees of the MDSP: Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mark Doyle, Shelburg, Kaufenberg, Halverson,[11] Van Osdale, Voigt, Wilson, Hamilton, Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter, Bastemeyer, Dejong, Paul, Tycz, Baker, Carpenter, Johnson, Unknown Department of Health Employees, Unknown DOC Contractors, Strom, Stolz, Gebes, Eilers, Warembourg, and Lippincott. *See* Docket 1 ¶¶ 7–18, 20–21, 23–35, 37–38, 43, 45; Docket 16 ¶¶ 1, 26, 39; Docket 12 ¶ 13. Thus, Counts's official capacity claims for injunctive relief against MDSP employees are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

The Eighth Circuit has held that a plaintiff's claims for injunctive relief were not moot against a defendant, such as an employee of the state department of corrections, who still has control over the plaintiff and the ability to conduct future wrongs and constitutional violations against the plaintiff after the plaintiff's transfer. *Randolph v. Rodgers*, 170 F.3d 850, 856–57 (8th Cir. 1999). Counts alleges that the following defendants are employed by the South Dakota DOC: Wasko, Haynes, Defenbaugh, Lengkeek, Dr. Wallinga, and Aguirre. *See* Docket 1 ¶¶ 6, 18, 36, 39, 40; Docket 16 ¶ 14. Counts alleges that

---

[11] Counts sues Halverson in her individual and official capacities as a former employee of Summit and a current employee of Aramark, companies that contracted with the government. *Id.* ¶¶ 18, 327. While Halverson is not employed by the MDSP, her place of employment is the MDSP. *Id.* Because Counts is no longer imprisoned at the facility where Halverson is employed, his claims for injunctive relief against her are moot.

Governor Noem is employed by the state of South Dakota. *See* Docket 12 ¶ 2. Because Counts is still imprisoned at a South Dakota DOC facility, the court will separately analyze the claims for injunctive relief against Wasko, Dr. Haynes, Defenbaugh, Lengkeek, Dr. Wallinga, Aguirre, and Governor Noem.

Counts asserts claims against Summit and Aramark in their official capacities and GTL Technology in its individual and official capacities. *See* Docket 1 ¶¶ 22, 41–42. Counts alleges that Summit was the previous food provider at MDSP and provided commissary under its contract with the DOC. *Id.* ¶ 41. He alleges Aramark is the current food provider at MDSP and provides commissary under its current contract with the DOC. *Id.* ¶ 42. Counts alleges that GTL Technology is the provider for LexisNexis and Westlaw at the MDSP. *Id.* ¶ 22. Counts is not seeking injunctive relief against Summit and GTL Technology. *See generally id.*; Docket 18 at 4. Counts no longer resides at the MDSP, and he is not subject to any conditions by Summit or GTL Technology. Thus, Counts's official capacity claims against Summit and GTL Technology are moot and dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). Counts alleges that Aramark currently contracts with the DOC as the food and commissary provider. Docket 1 ¶ 42; Docket 1 at 131. Because Counts was transferred to another South Dakota DOC facility, Aramark still oversees nutrition at the facility to which he was transferred. Thus, the court will separately analyze the claims for injunctive relief against Aramark.

### 3.   Religious Land Use for Incarcerated Persons Act ("RLUIPA") Claim

Construing Counts's complaint liberally, he asserts that Wasko, Fluke, and Voigt's actions violate RLUIPA. *See id.* ¶ 311; Docket 3 at 70–73. RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting 42 U.S.C. § 2000cc-5(7)(A)). "[A] prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation," and the prisoner must show that the prison policy substantially burdens the prisoner's exercise of religion. *Id.* at 360–61.

To establish a prima facie case under RLUIPA, a plaintiff must show "that the government practice substantially burdens the person's exercise of religion[.]" *Van Wyhe v. Reisch*, 581 F.3d 639, 649 (8th Cir. 2009) (citing 42 U.S.C. § 2000cc-2(b)). If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Fowler v. Crawford*, 534 F.3d 931, 940–41 (8th Cir. 2008). Counts claims that his religious exercise was substantially burdened because of the inability to have community togetherness. Thus, his RLUIPA claim against Fluke and Voigt in their individual capacities and Wasko in her official and individual capacities survives § 1915A screening.

### 4.    First Amendment

#### a.    Free Exercise

Counts claims that Wasko, Fluke, and Voigt violated his rights to free exercise of religion under the First Amendment. Docket 1 ¶ 311; Docket 3 at 71–73. In order to state a First Amendment free exercise claim, Counts must allege facts showing that prison officials have substantially burdened the free exercise of his religion. *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 813 (8th Cir. 2008). Substantially burdening the free exercise of religion means that the regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (cleaned up). Counts alleges that defendants have prevented him from freely exercising his religion by cancelling religious services due to staffing shortages. Docket 1 ¶ 311; Docket 3 at 71, 73. Counts states that "[t]he right to practice religion in a church with community is a religious right and it [is] also in the bible[.]" Docket 3 at 71. Thus, Counts's First Amendment free exercise claims against Fluke and Voigt in their individual capacities and Wasko in her official and individual capacities survive § 1915A screening.

#### b.    Right to Access the Courts

Counts brings claims for violation of his First Amendment right to access the courts against Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle,

Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Wilson, GTL Technology, Eilers, Aguirre, Warembourg, and Lippincott. Docket 1 ¶¶ 360–398; Docket 16 ¶¶ 1, 15, 27, 40. He claims that defendants have prevented him from filing grievances, provided inadequate legal assistance through the available technology and elimination of the contract attorney position, prevented him from filing lawsuits, prevented him from mailing legal mail, prevented him from accessing legal materials, and prevented him from typing material or obtaining help typing. Docket 1 ¶¶ 363–364, 368, 373–391, 393–398; Docket 2-2 at 37; Docket 16 ¶¶ 2, 17, 29; Docket 17 at 1–2. "The Constitution guarantees prisoners a right to access the courts." *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007). To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury because of the defendants' actions. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). To satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Johnson v. Missouri*, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting *Casey*, 518 U.S. at 353).

Counts alleges facts sufficient to state a claim for violation of his First Amendment right to access the courts. Counts alleges that defendants have impeded his legal claims by delaying his legal mail, preventing him from using commissary to send mail to the court, providing insufficient or inoperable research tablets, and denying his request for assistance to type his legal filings. Docket 1 ¶¶ 363–364, 368, 373–391, 393–398; Docket 2-2 at 37; Docket 16

¶¶ 2, 17, 29; Docket 17 at 1–2. Counts alleges personal conduct by Wasko, Fluke, Reyes, Schieffer, Kaufenberg, Tjeerdsma, Wilson, Eilers, Aguirre, and Warembourg. Thus, Counts's First Amendment access to the courts claims against Wasko, Fluke, Reyes, Schieffer, Kaufenberg, Tjeerdsma, Wilson, Eilers, Aguirre, and Warembourg in their individual capacities survive § 1915A screening. Counts's First Amendment access to the courts claims against Wasko, Lengkeek, and Aguirre in their official capacities and against GTL Technology survive § 1915A screening.

### c.    Right to Send and Receive Mail

Construing Counts's complaint liberally, he brings a claim for violation of his First Amendment free speech right to send and receive mail against Aguirre, Warembourg, Van Osdale, and Eilers. *See* Docket 16 ¶¶ 2, 19, 29–30; Docket 17 at 1–2. "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1997). "While prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights because of the needs of the penal system." *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (citing *Turner v Safley*, 482 U.S. 78, 84–85 (1987)). In *Turner*, the Supreme Court held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests." 482 U.S. at 89. The Eighth Circuit has applied *Turner*'s four-factor test to prison regulations regarding mail:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Thongvanh v. Thalacker*, 17 F.3d 256, 259 (8th Cir. 1994). This standard applies to both incoming and outgoing mail. *Id.*

Counts alleges facts sufficient to state a claim for deprivation of his First Amendment free speech right to send and receive mail. He alleges that mail to prisoners from outside medical providers are intercepted and delivered directly to medical. Docket 1 ¶ 158. Counts alleges that medical "removes any reports or information they choose to suppress before having the remainder of the correspondence delivered to the inmate." *Id.* Counts also alleges that he was limited to legal mailings of a $15.00 monthly maximum postage, contrary to a policy permitting inmates to pay additional postage from their personal accounts. Docket 16 ¶ 17; Docket 17 at 10. Counts also alleges that not all of his mail was sent after being placed in Warembourg's custody. Docket 16 ¶¶ 29–31, 33. Counts also claims his mail was slowed and his legal mail disappeared. *Id.* ¶ 34. Thus, Counts's First Amendment right to send and receive mail claim against Warembourg, Van Osdale, and Eilers in their individual capacities and Aguirre in her individual and official capacities survives § 1915A screening.

### d.   Retaliation

Counts claims that defendants have retaliated against him in violation of his First Amendment rights. Docket 1 ¶¶ 165, 201, 203–206, 208, 210, 212, 228–229, 259, 324, 445–446, 448–450; Docket 12 ¶¶ 13, 18; Docket 16 ¶¶ 1, 15, 27, 40. Counts alleges claims of retaliation against the following defendants: Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Halverson, Wilson, Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Aguirre, Warembourg, and Lippincott. Docket 1 ¶¶ 445–446, 448–450; Docket 12 ¶¶ 13, 18; Docket 16 ¶¶ 1, 15, 27, 40.

To allege a First Amendment retaliation claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson County*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). "[T]he plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." *Revels*, 382 F.3d at 876. "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994)).

56

Counts alleges facts sufficient to state First Amendment retaliation claims. Prison grievances and inmate lawsuits are protected activities under *Jacks. Id.* The adverse actions alleged by Counts, including refusal to treat medical issues, would chill a person of ordinary firmness from continuing to file grievances and lawsuits. *See, e.g.*, Docket 1 ¶¶ 165, 201, 203–206, 208, 210, 212, 228–229, 259, 324, 445–446, 448–450; Docket 12 ¶¶ 13, 18; Docket 16 ¶¶ 1, 15, 27, 40. Counts alleges that these adverse actions were motivated by his attempts to file grievances and lawsuits. Docket 1 ¶¶ 201, 203–206, 210. Thus, Counts's First Amendment retaliation claims against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Halverson, Wilson, Dr. Carpenter, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Warembourg, and Lippincott in their individual capacities and Wasko, Dr. Wallinga, Dr. Haynes, Lengkeek, Defenbaugh, and Aguirre in their individual and official capacities survive § 1915A screening.

### 5.    Fifth Amendment

Counts generally alleges that Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Wilson, Eilers, Aguirre, Warembourg, and Lippincott violated his Fifth Amendment rights. Docket 1 at 128–29; Docket 16 ¶¶ 1, 15, 27, 40. Construing Counts's complaint liberally, he alleges a violation of the Fifth Amendment Due Process Clause. The Fifth Amendment Due

57

Process Clause applies to the United States, but the Fourteenth Amendment Due Process Clause applies to the States. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). The defendants are employees of the state of South Dakota; thus, the Fourteenth Amendment Due Process Clause would apply, not the Fifth Amendment. Thus, Counts's due process claims against the defendants under the Fifth Amendment are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 6.   Sixth Amendment

Counts alleges that Warembourg and Lippincott violated his Sixth Amendment rights. Docket 16 ¶¶ 27, 40. The Sixth Amendment applies "[i]n all criminal prosecutions[.]" Const. amend. VI. Counts does not allege that Warembourg and Lippincott were involved in his criminal prosecution and does not allege any particular conduct that violated the Sixth Amendment. Thus, Counts's Sixth Amendment claims against Warembourg and Lippincott in their individual and official capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 7.   Eighth Amendment

#### a.   Medical Claims

Counts brings claims against Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mark Doyle, Caruna, Kaufenberg, Tjeersdma, Schryvers, Van Osdale, Lengkeek, Voight, Stoebner, Dr. Wallinga, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter,

Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Aguirre, Warembourg, Lippincott, and Dr. Carpenter for deliberate indifference to serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Docket 1 at 128–29; Docket 16 ¶¶ 1, 15, 27, 40.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately

disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citation and internal quotation omitted). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Counts alleges sufficient facts to state a claim for deliberate indifference to serious medical needs. He claims to have several serious medical conditions, including Hidradenitis, breathing complications, and heart concerns. *See generally* Docket 1 ¶¶ 46–264. Counts also claims that various prison officials were aware of and deliberately disregarded those needs. Although some of his claims may be mere disagreement with treatment decisions, the court cannot conclude at this stage that Counts's claims are wholly without merit. Counts's Eighth Amendment deliberate indifference claims against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their official capacities for injunctive relief survive § 1915A screening.

In order to state a claim against defendants in their individual capacities, Counts must allege that defendants participated in the unconstitutional conduct under *Ashcroft*. Counts does not allege that Caruna, Schryvers, Dr. Carpenter, Defenbaugh, Aguirre, Warembourg, and Lippincott participated in

the unconstitutional conduct. Thus, Eighth Amendment deliberate indifference claims against Caruna, Schryvers, Dr. Carpenter, Defenbaugh, Aguirre, Warembourg, and Lippincott in their individual capacities are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). Because Counts does allege participation in the unconstitutional conduct by the other named defendants, Counts's claims against Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mark Doyle, Kaufenberg, Tjeersdma, Van Osdale, Lengkeek, Voight, Stoebner, Wallinga, Haynes, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, and Eilers in their individual capacities survive § 1915A screening.

### b.    Conditions of Confinement

Counts brings claims against Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Halverson, Wallinga, Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Aguirre, Lippincott, Aramark for conditions of confinement that violate his Eighth Amendment right to be free from cruel and unusual punishment. Docket 1 at ¶¶ 445–446, 448, 450; Docket 12 ¶¶ 4–8, Docket 16 ¶¶ 1, 15, 40; Docket 18 ¶¶ 8–9. Construed liberally, his claims of insufficient nutrition, overcrowding, and understaffing are also conditions of confinement claims. *See* Docket 1 ¶¶ 327–333, 357, 399–425.

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The United States Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation and internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation omitted). In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk of harm posed by the deprivation. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 834). An Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981). Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *See id.*; *see also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir. 1989).

Counts alleges sufficient facts to state a claim for conditions of confinement in violation of his Eighth Amendment rights. The cumulative effect

of the alleged prison conditions is sufficiently serious to deprive Counts of "the minimal civilized measures of life's necessities" under *Hudson*. Further, he alleges that defendants were aware of and deliberately indifferent to the deprivation. Counts claims that each individual defendant participated in the unconstitutional conduct. Thus, his conditions of confinement claims against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Dr. Carpenter, Stoebner, Halverson, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, and Lippincott, in their individual capacities survive § 1915A screening. Counts's conditions of confinement claims against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their individual and official capacities and against Aramark survive § 1915A screening.

### 8.   Ninth Amendment

Counts alleges that Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Aguirre, and Warembourg violated his Ninth Amendment rights. Docket 1 ¶ 450; Docket 12 ¶¶ 13, 18; Docket 16 ¶¶ 1, 15, 27. The Ninth Amendment states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. "[T]he Ninth Amendment does not create substantive rights beyond those conferred by governing law[.]" *Gaslin v. Fassler*, 377 Fed. App'x 579, 580 (8th Cir. 2010) (per

curiam) (citing *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 9 (1st Cir. 2007)). Thus, Counts's Ninth Amendment claims fail to state a claim upon which relief can be granted and are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(i-ii) and 1915A(b)(1).

### 9. Fourteenth Amendment

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

### a. Due Process

Construing Counts's complaint liberally, he brings claims against Governor Noem and Wasko in their individual and official capacities and Fluke in his individual capacity for failure to investigate his medical claims and conditions of confinement. The Eighth Circuit has recognized a due process claim for criminal defendants against "reckless or intentional failure to investigate that shocks the conscience[.]" *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009). This claim applies when officials' conscience-shocking failure to investigate results in the denial of a criminal defendant's "interest in obtaining fair criminal proceedings[.]" *See id.* at 1183 n.2 (quoting *Wilson v. Lawrence Cnty*, 260 F.3d 946, 956 n.8 (8th Cir. 2001)). A criminal defendant can bring such a claim in the following circumstances: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's

64

innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id.* at 1184. Here, Counts does not allege that the defendants failed to investigate criminal charges against him. *See* Docket 1; Docket 12 ¶¶ 1–12. Thus, he fails to bring claims for failure to investigate under *Akins*, and his Fourteenth Amendment due process claims for failure to investigate against Governor Noem and Wasko in their individual and official capacities and Fluke in his individual capacity are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### b.  Equal Protection

Construing Counts's complaint liberally, he brings a Fourteenth Amendment Equal Protection claim against Wasko, Fluke, Reyes, Schieffer, Tammy Dole, Mike Doyle, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Wilson, Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Aguirre, Warembourg, and Lippincott. Docket 1 ¶¶ 445–446, 450; Docket 12 ¶¶ 13, 18; Docket 16 ¶¶ 1, 15, 27, 40. Counts alleges that he was treated differently from another inmate who had the same lung condition who was placed on lay-in meals. Docket 1 ¶ 206. Counts also alleges an equal protection violation because his mail is treated differently from other inmates and he is unable to use commissary to pay for legal mailing because he has filed lawsuits and grievances. Docket 16 ¶¶ 2, 14–20; Docket 17 at 1, 10.

The equal protection clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike," a protection that applies to prisoners. *Murphy*, 372 F.3d at 984 (quoting *Rouse v. Benton*, 193 F.3d 936, 942 (8th Cir. 1999)). The Eighth Circuit Court of Appeals has explained for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." *Patel*, 515 F.3d at 815 (citations and internal quotation omitted).

Counts alleges facts sufficient to state a Fourteenth Amendment equal protection claim. He alleges that he was treated differently from an inmate with the same lung condition because he had exercised his First Amendment rights, filing lawsuits and grievances, and that "is a clear example of retaliation." Docket 1 ¶ 206. Counts alleges specifically that he has been retaliated against by not properly receiving his lay-in meals, limitation on his ability to use commissary for legal mail, and delay in mailing his legal mail. *Id.*; Docket 16 ¶¶ 2, 14–20; Docket 17 at 1, 10.

Thus, Counts's Fourteenth Amendment Equal Protection claim against Fluke, Reyes, Schieffer, Tammy Dole, Mike Doyle, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Dr. Carpenter, Wilson, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Warembourg, and Lippincott in their individual capacities and against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes,

66

Defenbaugh, and Aguirre in their individual and official capacities survive § 1915A screening.

Construing Counts's complaint liberally, he also alleges an equal protection claim against GTL Technology for charging inmates ".05 cents per minute" for usage of services that are free to the general public. Docket 18 ¶ 5. But Counts fails to state an equal protection claim against GTL Technology because he does not allege that similarly situated people (namely other incarcerated) are treated differently. *See Murphy*, 372 F.3d at 984. Thus, Counts's equal protection claim against GTL Technology is dismissed without prejudice for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### 10.   ADA

Counts alleges that Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoeber, and Shelburg discriminated against him in violation of the ADA. Docket 1 ¶¶ 445–447. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). There are various means of discrimination under the ADA, including intentional discrimination, retaliation, and the failure to make reasonable accommodations. *See Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir.

67

2004); *Rinehart v. Weitzell*, 964 F.3d 684, 689 (8th Cir. 2009). To succeed on a failure to provide reasonable accommodations claim, Cody must show:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [penitentiary's] services, programs, or activities, or was otherwise subjected to discrimination by the [penitentiary]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010).

Here, Counts alleges sufficient facts to state a claim for intentional discrimination under the ADA. Intentional discrimination is also known as disparate treatment. *Peebles*, 354 F.3d at 765. "In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals. The key element is discriminatory intent." *Id.* at 766 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). Count's lung conditions and mobility issues render him a qualified individual with a disability. *See* 42 U.S.C. § 12102(1) (defining "disability" under the ADA). Counts alleges that Shelburg terminated him from the electrician program because of his disability. Docket 1 ¶ 275. Because this court is unable at this time to determine that Counts's claim against Shelburg is without merit, Counts's ADA claim for intentional discrimination against Shelburg in his individual capacity survives § 1915A screening.

Counts also brings a claim for failure to provide reasonable accommodations in violation of the ADA against Wasko, Fluke, Reyes,

Schieffer, Tammy Doyle, Mike Doyle, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoeber, and Shelburg. *Id.* ¶¶ 445–447. He alleges that he was excluded from participating in programming and obtaining EDCs because of his disability. *Id.* In order to show that the exclusion was "by reason of his disability[,]" Counts need not show that the exclusion was motivated by a discriminatory purpose, only that his exclusion was caused by his disability. *See Layton v. Elder*, 143 F.3d 469, 470–72 (8th Cir. 1998) (finding that wheelchair-using plaintiff had been "excluded . . . because of his disability" when he could not attend a meeting on the inaccessible second floor of the courthouse, even though there was no showing of intent to discriminate). Counts alleges that he is excluded from prison programming because of his disability. He is unable to lift the required weight to participate in the electrical programming, and he is unable to participate in the welding and automotive class due to his disabilities. Docket 1 ¶¶ 133, 262, 277, 290–291. But Counts does not allege individual conduct by Schryvers. Thus, Counts's ADA claim for failure to provide reasonable accommodations against Schryvers in her individual capacity is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l). But Counts's ADA claim for failure to provide reasonable accommodations against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Kaufenberg, Tjeerdsma, Van Osdale, Voigt, Stoeber, and Shelburg in their individual capacities and against Wasko and Lengkeek in their individual and official capacities survives § 1915A screening.

69

### 11.    Rehabilitation Act Claims

Construing Counts's complaint liberally, he brings claims against Wasko,

Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Kaufenberg, Tjeerdsma, Van

Osdale, Lengkeek, Voigt, Stoeber, and Shelburg for violations of the

Rehabilitation Act. Docket 1 ¶¶ 265–326. Under the Rehabilitation Act,

> [n]o otherwise qualified individual with a disability in the United
> States . . . shall, solely by reason of her or his disability, be excluded
> from the participation in, be denied the benefits of, or be subjected
> to discrimination under any program or activity receiving Federal
> financial assistance or under any program or activity conducted by
> any Executive agency[.]

29 U.S.C. § 794(a).

To establish a prima facie claim under the Rehabilitation Act, the

plaintiff must show that "1) he is a person with a disability as defined by

statute; 2) he is otherwise qualified for the benefit in question; and 3) he was

excluded from the benefit due to discrimination based upon disability."

*Randolph*, 170 F.3d at 858 (explaining that the Rehabilitation Act follows the

same analysis as claims under the Americans with Disabilities Act but with the

additional element that the program or activity receives federal funding); *see*

*also Gorman v. Bartch*, 152 F.3d 907, 911–12 (8th Cir. 1998). This court has

held that the Rehabilitation Act does not allow individual liability. *See*

*Landman v. Kaemingk*, 4:18-CV-04175-KES, 2020 WL 3608288, at *2, 2020

U.S. Dist. LEXIS 116598, at *4 (D.S.D. July 2, 2020).

Counts alleges that defendants receive federal funding. Docket 1 at 131.

But because the Rehabilitation Act does not allow individual liability, Counts

70

cannot bring Rehabilitation Act claims against individual defendants in their individual capacities. Thus, Count's Rehabilitation Act claims against individual defendants in their individual capacities are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), but his Rehabilitation Act claims against Wasko and Lengkeek in their official capacities survive § 1915A screening.

### 12.   42 U.S.C. § 1985(3) Civil Conspiracy Claim

Counts brings a civil conspiracy claim under 42 U.S.C. § 1985(3) against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Wilson, Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Aguirre, Warembourg, and Lippincott. Docket 1 ¶¶ 446, 449–450; Docket 16 ¶¶ 15, 27, 40. To state a claim under 42 U.S.C. § 1985, Counts must allege:

> (1) the existence of a civil conspiracy; (2) that the purpose of the conspiracy was to deprive [him] either directly or indirectly of [his] civil rights; (3) that a conspirator did an act in furtherance of the object of the conspiracy; and (4) damages, shown by demonstrating either injury to person or property or the deprivation of a civil right.

*Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999); *see also Dubray v. Rosebud Hous. Auth.*, 565 F. Supp. 462, 466 (D.S.D. 1983). For § 1985(3) to apply, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971). "[E]vidence of purposeful discrimination

must be produced to avoid dismissal of a § 1985(3) claim." *Schmidt v. Big Boy*, 5:05-CV-05036-KES, 2007 WL 858419, at *10, 2007 U.S. Dist. LEXIS 19758, at *34 (D.S.D. Mar. 20, 2007).

Here, Counts does not allege facts sufficient to state a civil conspiracy claim under 42 U.S.C. § 1985(3). He alleges that defendants conspired to deprive him of his constitutional rights. *See* Docket 1 ¶¶ 446, 449–450; Docket 16 ¶¶ 15, 27, 40. Under 42 U.S.C. § 1985(3), "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin* 403 U.S. at 102. Counts does not allege sufficient facts showing a racial or class-based discriminatory animus. Thus, Count's § 1985(3) civil conspiracy claim against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Wilson, Dr. Carpenter, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Warembourg, and Lippincott in their individual capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). Counts's § 1985(3) civil conspiracy claim against Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their individual and official capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 13. HIPAA

Counts alleges a violation of HIPAA by Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, Dejong, Fejfar, and Stolz. Docket 1 ¶ 450. "Courts have repeatedly held that HIPAA does not create a private right in implied-right-of action cases. Since HIPAA does not create a private right, it cannot be privately enforced either via § 1983 or through an implied right of action." *Adams v. Eureka Fire Prot. Dist.*, 352 F. App'x 137, 138–39 (8th Cir. 2009) (per curiam) (internal citations omitted). Thus, Counts's HIPAA claims against Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, Dejong, Fejfar, and Stolz are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 14. Unspecified Claims Against Melissa Johnson

Counts's complaint names as a defendant Melissa Johnson, as the director of nursing at the MDSP. Docket 1 ¶ 38. The complaint does not assert any claims against Johnson or otherwise allege that she was involved with violating Counts's constitutional rights. Thus, Counts fails to state a claim upon which relief can be granted against Johnson, and Counts's claims against Johnson are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## II.    Motion to Appoint Counsel

Counts moves for appointment of counsel. Docket 10. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). The court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). When determining whether to appoint counsel to a pro se litigant, the court considers the "factual complexity of the case, the ability of the indigent to investigate the facts, the existence of conflicting testimony, the ability of the indigent to present his claim and the complexity of the legal issues." *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991) (citation omitted). Counts's claims do not appear to be factually or legally complex, and his filings clearly set forth his claims. Because this court believes that Counts can adequately present his claims at this time, his motion for appointment of counsel, Docket 10, is denied.

## III.    Motion for Temporary Restraining Order and Preliminary Injunction

The four factors the court considers in determining whether to grant preliminary injunctive relief are: " '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.' " *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting Da*taphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). Since *Dataphase*, the Eighth Circuit Court of Appeals has "observed that the 'likelihood of success on the

merits is most significant.' " *Id.* (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)). Counts cannot at this stage show that he is likely to succeed on the merits.

Counts's motion for a temporary restraining order and preliminary injunction, Docket 14, requests that (1) he be transferred to a facility where he could avoid conditions such as "smoke, chemicals, humidity, heat, cold weather, excessive dust, and stress"; (2) he be allowed to pay for legal mail by commissary slips after exceeding the allotted $15.00 per month; and (3) order the SD DOC "to comply with all of Dr[.] Pietila pulmonary specialist orders for plaintiff to insure [sic] plaintiff's safety and health." Docket 14 at 7. Counts has been transferred from the MDSP to the SDSP. Because Counts has been transferred and is no longer subject to the conditions at MDSP, Counts's request to be transferred to another facility is now moot. The court has insufficient information to determine if the defendants still restrict Counts's mail commissary slip or if the DOC has complied with Dr. Pietila's recommendations. But the existence of these conditions is not dispositive for the motion's outcome because Counts cannot show at this stage that he is likely to succeed on the merits of his claims. Thus, his motion for a temporary restraining order, Docket 14, is denied.

Thus, it is ORDERED:

1.    That Count's claims for money damages against Governor Noem, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott in

their official capacities are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

2.   That Counts's official capacity claims for injunctive relief against Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mark Doyle, Shelburg, Kaufenberg, Halverson, Van Osdale, Voigt, Wilson, GTL Technology, Hamilton, Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter, Bastemeyer, Dejong, Paul, Tycz, Baker, Carpenter, Johnson, Unknown Department of Health Employees, Unknown DOC Contractors, Strom, Stolz, Gebes, Eilers, Warembourg, Lippincott, Summit, and GTL Technology are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

3.   That Counts's RLUIPA claim against Fluke and Voigt in their individual capacities and Wasko in her individual and official capacities survives § 1915A screening.

4.   That Counts's First Amendment free exercise claims against Fluke and Voigt in their individual capacities and Wasko in her individual and official capacities survive § 1915A screening.

5.   That Counts's First Amendment access to the courts claims against Wasko, Fluke, Reyes, Schieffer, Kaufenberg, Tjeerdsma, Wilson, Eilers, Aguirre, and Warembourg in their individual and official capacities, against Tammy Doyle, Mike Doyle, Caruna, Schryvers, Van Osdale, Lengkeek, Voigt, Stoebner, Eilers, Aguirre,

76

Warembourg, and Lippincott in their official capacities, and against GTL Technology (AKA ViaPath) survive § 1915A screening.

6.   That Counts's First Amendment access to the courts claims against Wasko and Aguirre in their individual and official capacities and Fluke, Reyes, Schieffer, Kaufenberg, Tjeerdsma, Wilson, Eilers, Aguirre, Warembourg, and GTL Technology in their individual capacities survive § 1915A screening.

7.   That Counts's First Amendment right to send and receive mail claim against Warembourg, Van Osdale, and Eilers in their individual capacities and Aguirre in her individual and official capacities survives § 1915A screening.

8.   That Counts's First Amendment retaliation claims against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Halverson, Wilson, Dr. Carpenter, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Warembourg, and Lippincott in their individual capacities and Wasko, Dr. Wallinga, Dr. Haynes, Lengkeek, Defenbaugh, and Aguirre in their individual and official capacities survive § 1915A screening.

9.   That Counts's due process claims against the defendants under the Fifth Amendment are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

10.     That Counts's Sixth Amendment claims against Warembourg and
        Lippincott in their individual and official capacities are dismissed
        without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and
        1915A(b)(1).

11.     That Counts's Eighth Amendment deliberate indifference claims
        against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh,
        and Aguirre in their official capacities for injunctive relief survive
        § 1915A screening.

12.     That Counts's Eighth Amendment deliberate indifference claims
        against Caruna, Schryvers, Dr. Carpenter, Defenbaugh, Aguirre,
        Warembourg, and Lippincott in their individual capacities are
        dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

13.     That Counts's Eighth Amendment deliberate indifference claims
        against Wasko, Fluke, Reyes, Schieffer, Tammy Doyle, Mark Doyle,
        Kaufenberg, Tjeersdma, Van Osdale, Lengkeek, Voight, Stoebner,
        Wallinga, Haynes, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz,
        Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar,
        Stolz, and Eilers in their individual capacities survive § 1915A
        screening.

14.     That Counts's conditions of confinement claims against Fluke,
        Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg,
        Tjeerdsma, Schryvers, Van Osdale, Voigt, Dr. Carpenter, Stoebner,
        Halverson, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder,

Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, and Lippincott, in their individual capacities survive § 1915A screening.

15. That Counts's conditions of confinement claims against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their individual and official capacities and against Aramark survive § 1915A screening.

16. That Counts's Ninth Amendment claims are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(i-ii) and 1915A(b)(1).

17. That Counts's Fourteenth Amendment due process claims for failure to investigate against Governor Noem and Wasko in their individual and official capacities and Fluke in his individual capacity are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

18. That Counts's Fourteenth Amendment Equal Protection claims against Fluke, Reyes, Schieffer, Tammy Dole, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Dr. Carpenter, Wilson, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Eilers, Warembourg, and Lippincott in their individual capacities and against Wasko, Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their individual and official capacities survive § 1915A screening.

79

19. That Counts's equal protection claim against GTL Technology is dismissed without prejudice for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

20. That Counts's ADA claim for intentional discrimination against Shelburg in his individual capacity survives § 1915A screening.

21. That Counts's ADA claim for failure to provide reasonable accommodations against Schryvers in her individual capacity is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

22. That Counts's ADA claim for failure to provide reasonable accommodations against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Kaufenberg, Tjeerdsma, Van Osdale, Voigt, Stoeber, and Shelburg in their individual capacities and against Wasko and Lengkeek in their individual and official capacities survive § 1915A screening.

23. That Counts's Rehabilitation Act claims against individual defendants in their individual capacities are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

24. That Counts's Rehabilitation Act claims against Wasko and Lengkeek in their official capacities survive § 1915A.

25. That Count's § 1985(3) civil conspiracy claim against Fluke, Reyes, Schieffer, Tammy Doyle, Mike Doyle, Caruna, Kaufenberg, Tjeerdsma, Schryvers, Van Osdale, Voigt, Stoebner, Wilson, Dr. Carpenter, Zimmer, Paul, Baker, Hamilton, Gebes, Tycz, Mudder,

Fisher, McGrath, Klawitter, Bastemeyer, DeJong, Fejfar, Stolz, Warembourg, and Lippincott is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

26. That Counts's § 1985(3) civil conspiracy claim against Lengkeek, Dr. Wallinga, Dr. Haynes, Defenbaugh, and Aguirre in their individual and official capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

27. That Counts's HIPAA claims against Dr. Wallinga, Dr. Carpenter, Dr. Haynes, Zimmer, Paul, Baker, Defenbaugh, Hamilton, Gebes, Tycz, Mudder, Fisher, McGrath, Klawitter, Bastemeyer, Dejong, Fejfar, and Stolz are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

28. That Counts's claims against Johnson are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

29. That Counts's motion to appoint counsel, Docket 10, is denied.

30. That Counts's motion for a temporary restraining order, Docket 14, is denied.

31. That the Clerk of Court shall send blank summons forms and Marshall Service Forms (Form USM-285) to Counts so that he may cause the complaint to be served upon defendants  Wasko, Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mike Doyle, Shelburg, Kaufenberg, Halverson, Dr. Haynes, Van Osdale, Voigt, Aramark, GTL Technology, Wilson, Hamilton,

Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter, Bastemeyer, Dejong, Paul, Tycz, Baker, Defenbaugh, Carpenter, Lengkeek, Dr. Wallinga, Unknown Doc Employees, Unknown Department Of Health Employees, Unknown Doc Contractors, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott.

32.   That Counts shall complete and send the Clerk of Court a separate summons and USM-285 form for defendants Wasko, Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mike Doyle, Shelburg, Kaufenberg, Halverson, Dr. Haynes, Van Osdale, Voigt, Aramark, GTL Technology, Wilson, Hamilton, Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter, Bastemeyer, Dejong, Paul, Tycz, Baker, Defenbaugh, Carpenter, Lengkeek, Dr. Wallinga, Unknown Doc Employees, Unknown Department Of Health Employees, Unknown Doc Contractors, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott.

33.   That the United States Marshal Service shall serve the completed summons, together with a copy of the complaint (Docket 1), the supplements to the complaint that allege additional facts (Dockets 11, 12, 13, 16, and 18), and this order, upon defendants Wasko, Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mike Doyle, Shelburg, Kaufenberg, Halverson, Dr. Haynes, Van Osdale, Voigt, Aramark, GTL Technology, Wilson, Hamilton, Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter,

Bastemeyer, Dejong, Paul, Tycz, Baker, Defenbaugh, Carpenter, Lengkeek, Dr. Wallinga, Unknown Doc Employees, Unknown Department Of Health Employees, Unknown Doc Contractors, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott.

34.　That defendants Wasko, Fluke, Reyes, Schieffer, Caruna, Stoebner, Tjeerdsma, Schryvers, Tammy Doyle, Mike Doyle, Shelburg, Kaufenberg, Halverson, Dr. Haynes, Van Osdale, Voigt, Aramark, GTL Technology, Wilson, Hamilton, Zimmer, Mudder, Fisher, Fejfar, McGrath, Klawitter, Bastemeyer, Dejong, Paul, Tycz, Baker, Defenbaugh, Carpenter, Lengkeek, Dr. Wallinga, Unknown Doc Employees, Unknown Department Of Health Employees, Unknown Doc Contractors, Strom, Stolz, Gebes, Eilers, Aguirre, Warembourg, and Lippincott will serve and file an answer or responsive pleading to the complaint on or before 21 days following the date of service or 60 days if the defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

35.　That Counts will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

Dated November 28, 2023.

BY THE COURT:

_/s/ Karen E. Schreier_
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE